**EXHIBIT**

**4**

## LOAN AND SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT (this "Agreement") dated as of October 29, 2024, is entered into by Daniel P. Higgins ("Borrower"), for the benefit of Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) ("Lender").

In consideration of the covenants, conditions, representations, and warranties contained in this Agreement, the parties agree as follows:

**1.     DEFINITIONS.** As used herein, the following terms shall have the following meanings (all terms defined in this Section or in any other provision of this Agreement in the singular are to have the plural meanings when used in the plural and vice versa, and whenever the context requires, each gender shall include any other gender):

**1.1.     "Agreement"** shall mean this Loan and Security Agreement together with all schedules and exhibits hereto, as amended, supplemented or otherwise modified from time to time.

**1.2.     "Applicable Law"** shall mean: (a) with respect to matters relating to the creation, perfection and procedures relating to the enforcement of the liens created pursuant to a Security Instrument (including specifically, without limitation, the manner of establishing the amount of any deficiency for which Borrower is liable after any foreclosure of any Real Property Collateral), the laws of the state where the Real Property Collateral subject to such Security Instrument is located; or (b) with respect to any other Loan Document (including but not limited to the Note and this Agreement) the laws of the State of California (or any other jurisdiction whose laws are mandatorily applicable notwithstanding the parties' choice of California law). In either case, Applicable Law shall refer to such laws, as such laws now exist, or may be changed or amended or come into effect in the future.

**1.3.     "Attorneys' Fees."** Any and all attorney fees (including the allocated cost of in-house counsel), paralegal, and law clerk fees, including, without limitation, fees for advice, negotiation, consultation, arbitration, and litigation at the pretrial, trial, and appellate levels, and in any bankruptcy proceedings, and attorney costs and expenses incurred or paid by Lender as provided in the Loan Documents.

**1.4.     "Collateral"** shall mean the collateral described in Section 2 below.

**1.5.     "Environmental Laws"** shall mean any Governmental Requirements pertaining to health, industrial hygiene, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) as amended (42 United States Code ("U.S.C.") §§ 9601-9675); the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. §§ 6901-6992k); the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101-5127); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251-1376); the Clean Air Act (42 U.S.C. §§ 7401-7671q); the Toxic Substances Control Act (15 U.S.C. §§ 2601-2692); the Refuse Act (33 U.S.C. §§ 407-426p); the Emergency Planning and Community Right-To-Know Act (42 U.S.C. §§ 11001-11050); the Safe Drinking Water Act (42 U.S.C. §§ 300f-300j), and all present or future environmental quality or protection laws, statutes or codes or other requirements of any federal or state governmental unit, or of any regional or local governmental unit with jurisdiction over the Collateral.

**1.6.     "Event of Default"** shall mean any event specified in the Event of Default heading below.

**1.7.     "Governmental Authority"** shall mean any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

**1.8.     "Governmental Requirements"** shall mean any and all laws, statutes, codes, ordinances, regulations, enactments, decrees, judgments, and orders of any Governmental Authority.

**1.9.     "Hazardous Materials"** means any and all (a) substances defined as "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act (49 United States Code §§5101-5127), and in the regulations promulgated

1

Val-Chris00176

under those laws; (b) substances defined as "hazardous wastes" under Environmental Laws and in the regulations promulgated under that law in the State where the Real Property Collateral is located and in the regulations promulgated under that law; (c) substances defined as "hazardous substances" under Environmental Laws in the State where the Real Property Collateral is located; (d) substances listed in the United States Department of Transportation Table (49 Code of Federal Regulations § 172.101 and amendments); (e) substances defined as "medical wastes" under Environmental Laws in the State where the Real Property Collateral is located; (f) asbestos-containing materials; (g) polychlorinated biphenyl; (h) underground storage tanks, whether empty, filled, or partially filled with any substance; (i) petroleum and petroleum products, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any such mixture; and (j) such other substances, materials, and wastes that are or become regulated under applicable local, state, or federal law, or that are classified as hazardous or toxic under any Governmental Requirements or that, even if not so regulated, are known to pose a hazard to the health and safety of the occupants of the Real Property Collateral or of real property adjacent to it.

1.10. **"Indebtedness"** means the principal of, interest on, and all other amounts and payments due under or evidenced by the following:

1.10.1. The Note (including, without limitation, any prepayment premium, late payment, and other charges payable under the Note);

1.10.2. This Agreement;

1.10.3. The Security Instrument and all other Loan Documents;

1.10.4. All funds later advanced by Lender to or for the benefit of Borrower under any provision of any of the Loan Documents;

1.10.5. Any future loans or amounts advanced by Lender to Borrower when evidenced by a written instrument or document that specifically recites that the Secured Obligations evidenced by such document are secured by the terms of the Security Agreement, including, but not limited to, funds advanced to protect the security or priority of the Security Agreement; and

1.10.6. Any amendment, modification, extension, rearrangement, restatement, renewal, substitution, or replacement of any of the foregoing.

1.11. **"Insurance Rating Requirements"** means the requirements for a property insurance policy issued by an insurer having a claims-paying or financial strength rating of any one of the following: (A) at least "A-:VIII" from A.M. Best Company, (B) at least "A3" (or the equivalent) from Moody's Investors Service, Inc. or (C) at least "A-" from Standard & Poor's Ratings Service.

1.12. **"Lender Retained Funds"** shall mean all of Borrower's right, title and interest in and to any funds retained by the Lender or its agents including but not limited to any Appraisal Holdbacks, Debt Service Holdbacks, Default Reserves, Impounds, Construction Reserves, Construction Completion Holdbacks, Repair Holdbacks, Tax Holdbacks, Capital Expenditure Holdbacks and Insurance Holdbacks.

1.13. **"Loan"** shall mean the loan and financial accommodations made by the Lender to the Borrower in accordance with the terms of this Agreement and the Loan Documents.

1.14. **"Loan Amount"** shall mean Three Hundred Thirty Thousand and 00/100 Dollars ($330,000.00).

1.15. **"Loan Document(s)"** means this Agreement, the Note, Security Agreement, and any other agreement executed in connection therewith, all other documents evidencing, securing or otherwise governing the Loan between Lender, Borrower, any guarantor, pledgor, or debtor, whether now existing or made in the future, and all amendments, modifications, and supplements thereto. Notwithstanding the foregoing, when used in the definitions of Indebtedness, Secured Obligations, and Obligations, and in relation to the discussion of the Secured Obligations, Obligations and Indebtedness that are secured by any Security Agreement, the term "Loan Documents" specifically excludes any

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement      Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00177

Guaranty and Environmental Indemnity Agreement, each of which are not secured by any Security Agreement unless specifically identified therein.

**1.16.** **"Maturity Date"** shall mean November 1, 2025.

**1.17.** **"Note(s)"** means any and all promissory notes payable by Borrower, as maker to the order of Lender or order, executed concurrently herewith or subsequent to the execution of this Agreement, evidencing a loan from Lender to Borrower, together with any interest thereon at the rate provided in such promissory note and any modifications, extensions or renewals thereof, whether or not any such modification, extension is evidenced by a new or additional promissory note or notes. Note shall include the Secured Note of even date herewith payable by Borrower to the order of Lender in the amount of Three Hundred Thirty Thousand and 00/100 Dollars ($330,000.00), which matures on the Maturity Date, evidencing the Loan, in such form as is acceptable to Lender, together with any and all rearrangements, extensions, renewals, substitutions, replacements, modifications, restatements, and amendments to the Secured Note.

**1.18.** **"Person"** means any natural person, business, corporation, company, and or association, limited liability company, partnership, limited partnership, limited liability partnership, joint venture, business enterprise, trust, government authority or other legal entity.

**1.19.** **"Personal Property Collateral"** shall mean any property pledged to secure the Note that is not Real Property Collateral.

**1.20.** **"Real Property Collateral"** shall mean all Mortgaged Property described in the Security Instrument(s), commonly known as 3001 Kleinmann Avenue, Galveston, Texas 77551.

**1.21.** **"Secured Obligations"** shall have the meaning defined in Section 2 below and shall include all Indebtedness, obligations, and liabilities of the Borrower under the Loan Documents, whether on account of principal, interest, indemnities, fees (including, without limitation, Attorneys' Fees, remarketing fees, origination fees, collection fees, and all other professional fees), costs, expenses, taxes, or otherwise.

**1.22.** **"Security Agreement"** shall mean any and all agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract or otherwise creating, evidencing, governing or representing a security interest of Lender in the Collateral securing the Secured Obligations, including, but not limited to any Collateral Security Agreement, Security Instrument, or Ownership Interest Pledge Agreement, as applicable. The term shall refer to all Security Agreements both individually and collectively.

**1.23.** **"Security Instrument(s)"** shall mean any and all agreements of even date herewith that secure the Real Property Collateral, including but not limited to any (i) Deeds of Trust, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (ii) Mortgages, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (iii) Deeds to Secure Debt, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, (iv) Security Deeds, Assignment of Leases and Rents, Fixture Filing, and Security Agreement, and (v) Mortgages.

**1.24.** **"Tenant Affiliate"** shall mean any occupant of the Real Property Collateral, other than Borrower, that is directly or indirectly controlling, controlled by or under common control with, the Borrower.

Capitalized terms not otherwise defined shall have their respective meanings as defined in the Loan Documents.

## 2. GENERAL.

**2.1.** **Amount and Purpose.** In reliance on Borrower's representations and warranties, and subject to the terms and conditions in this Agreement and in the Loan Documents, Lender agrees to make the Loan to Borrower on the terms and conditions set forth in the Note, this Agreement and the other Loan Documents.

---

3

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement      Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00178

**2.2. Payment.** Borrower shall repay the Loan in accordance with the provisions of the Note. The principal balance outstanding under the Note shall be due and payable in full on the Maturity Date.

**2.3. Loan Documentation and Security.** Borrower shall execute and acknowledge, or obtain the execution and acknowledgment of, and deliver concurrently with this Agreement, the Loan Documents and other documents signed in connection with this Agreement. Any reference to the Loan Documents shall refer to such documents as they may be amended, renewed, or extended from time to time with the written approval of Lender. All of the Loan Documents shall be in form and substance satisfactory to Lender and shall include such consents from third parties as Lender deems necessary or appropriate.

**2.4. Creation of Security Interest; Collateral.** For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and for the purpose of securing the full and timely payment and performance of the Secured Obligations for the benefit of Lender, Borrower hereby irrevocably and unconditionally grants, transfers, bargains, conveys and assigns to the Lender a continuing general, lien on, and security interest in, all the Borrower's estate, right, title, and interest that the Borrower now has or may later acquire in and to the following, which shall be collectively referred to as the "Collateral":

    **2.4.1. Real Property Collateral.** All Real Property Collateral.

    **2.4.2. Personal Property Collateral.** All Personal Property Collateral.

    **2.4.3. Borrower Funds.** All of Borrower's interest in and to the proceeds of the Secured Obligations, whether disbursed or not; all present and future monetary deposits given by Borrower to any public or private utility with respect to utility services furnished to the Real Property Collateral; all Lender Retained Funds; and all accounts maintained by the Borrower with Lender or any subsidiary or affiliate of Lender, including, without limitation, any accounts established in connection with the Secured Obligations regardless of whether or not such accounts are with Lender;

    **2.4.4. Lender Retained Funds.** The Lender Retained Funds shall be subject to the sole and absolute control of Lender during the term of this Agreement. Borrower shall execute such documents and take such other action as may be requested by Lender to ensure in Lender such sole and absolute control. Borrower shall have no right to the Lender Retained Funds except as provided in this Agreement and the Note. Upon the maturity of the Note, any remaining funds in the Lender Retained Funds shall be credited against amounts due under the Note. Upon the occurrence of an Event of Default hereunder, Lender shall have (i) the right to withdraw all or any portion of the Lender Retained Funds and apply the Lender Retained Funds against the amounts owing under the Note, or any other Loan Document in such order of priority as Lender may determine; (ii) all rights and remedies of a secured party under the Uniform Commercial Code; or (iii) the right to exercise all remedies under the Loan Documents or otherwise available in law or in equity. Unless an agreement is made in writing or applicable law requires interest to be paid on the Lender Retained Funds, Lender shall not be required to pay Borrower any interest or earnings on the Lender Retained Funds.

    **2.4.5. Additional Property.** Any additional personal property otherwise set forth in the Loan Documents;

    **2.4.6. Proceeds.** All proceeds of, supporting obligations for, additions and accretions to, substitutions and replacements for, and changes in any of the Collateral described in this Agreement.

**2.5. Secured Obligations.** Borrower grants a security interest in the Collateral for the purpose of securing the following Secured Obligations:

    **2.5.1. Notes.** Payment of all obligations at any time under any and all Notes.

    **2.5.2. Loan Documents.** Payment and/or performance of each and every other obligation of Borrower under the Loan Documents;

    **2.5.3. Related Loan Documents.** Payment and/or performance of each covenant and obligation on the part of Borrower or its affiliates to be performed pursuant to any and all Loan Documents that have been or may be executed by Borrower or its affiliates evidencing or securing one or more present or future loans by Lender or its affiliates to Borrower or its affiliates (each a "Related Loan," and collectively, the "Related Loans"), whether now existing or made in the future, together

4

Val-Chris00179

with any and all modifications, extensions and renewals thereof; provided, however, that nothing contained herein shall be construed as imposing an obligation upon Lender, or as evidencing Lender's intention, to make any Related Loan to Borrower or its affiliates;

    **2.5.4.** **Future Obligations.** Payment to Lender of all future advances, Indebtedness and further sums and/or performance of such further obligations as Borrower may undertake to pay and/or perform (whether as principal, surety or guarantor) for the benefit of Lender, its successors and assigns, (it being contemplated by Borrower and Lender that Borrower may hereafter become indebted to Lender in such further sum or sums), when such borrower and/or obligations are evidenced by a written instrument reciting that it or they are secured by this Agreement and a related Security Instrument or Security Agreement; and

    **2.5.5.** **Modifications and Payments.** Payment and performance of all modifications, amendments, extensions, and renewals, however evidenced, of any of the Secured Obligations.

**2.6.** **Application of Payments.** Except as otherwise expressly provided by Governmental Requirements or any other provision of the Loan Documents, all payments received by Lender from Borrower under the Loan Documents shall be applied by Lender in the following order: (a) costs, fees, charges, and advances paid or incurred by Lender or payable to Lender and interest thereon under any provision of this Agreement, the Note, the Security Agreement, or any other Loan Documents, in such order as Lender, in its sole and absolute discretion, elects, (b) interest payable under the Note, and (c) principal under the Note.

**2.7.** **Termination.** This Agreement shall terminate following the repayment in full of all amounts due under the Note, this Agreement and any other documents evidencing the Loan, so long as no written claim has been made hereunder prior to such expiration date.

**3.** **BORROWER'S REPRESENTATIONS AND WARRANTIES.** To induce Lender to make the Loan, Borrower represents and warrants as follows, which representations and warranties shall be true and correct as of the execution of this Agreement and shall survive the execution and delivery of the Loan Documents:

**3.1.** **Capacity.** Borrower and the individuals executing Loan Documents on Borrower's behalf have the full power, authority, and legal right to execute and deliver, and to perform and observe the provisions of this Agreement, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan, and to carry out the contemplated transactions. All signatures of Borrower and Guarantor, and the individuals executing Loan Documents on their respective behalf, are genuine.

**3.2.** **Authority and Enforceability.** Borrower's execution, delivery, and performance of this Agreement, the other Loan Documents, and any other document, agreement, certificate, or instrument executed in connection with the Loan, have been duly authorized by all necessary corporate or other business entity action and do not and shall not require any registration with, consent, or approval of, notice to, or any action by any Person or Governmental Authority. Borrower has obtained or will obtain all approvals necessary for Borrower to comply with the Loan Documents. This Agreement, the Note, and the other Loan Documents executed in connection with the Loan, when executed and delivered by Borrower, shall constitute the legal, valid, binding, and joint and several obligations of Borrower enforceable in accordance with their respective terms.

**3.3.** **Compliance with Other Instruments.** The execution and delivery of this Agreement and the other Loan Documents, and compliance with their respective terms, and the issuance of the Note and other Loan Documents as contemplated in this Agreement, shall not result in a breach of any of the terms or conditions of, or result in the imposition of, any lien, charge, or encumbrance (except as created by this Agreement, the Security Agreement and the other Loan Documents) on any Collateral, or constitute a default (with due notice or lapse of time or both) or result in an occurrence of an event for which any holder

5

Val-Chris00180

or holders of indebtedness may declare the same due and payable under, any indenture, agreement, order, judgment, or instrument to which Borrower is a party or by which Borrower or its properties may be bound or affected.

**3.4.** **Compliance with Law.** The execution and delivery of this Agreement, the Note, and the other Loan Documents, or any other document, agreement, certificate, or instrument to which Borrower is bound in connection with the Loan, do not conflict with, result in a breach or default under, or create any lien or charge under any provision of any Governmental Requirements to which it is subject and shall not violate any of the Governmental Requirements.

**3.5.** **Adverse Events.** Since the date of the financial statements delivered to Lender before execution of this Agreement, neither the condition (financial or otherwise) nor the business of Borrower and the Collateral have been materially adversely affected in any way.

**3.6.** **Litigation.** There are no actions, suits, investigations, or proceedings pending or, to Borrower's knowledge after due inquiry and investigation, threatened against or affecting Borrower at law or in equity, before or by any Person or Governmental Authority, that, if adversely determined, would have a material adverse effect on the business, properties, or condition (financial or otherwise) of Borrower or on the validity or enforceability of this Agreement, any of the other Loan Documents, or the ability of Borrower to perform under any of the Loan Documents.

**3.7.** **No Untrue Statements.** All statements, representations, and warranties made by Borrower in this Agreement or any other Loan Document and any other agreement, document, certificate, or instrument previously furnished or to be furnished by Borrower to Lender under the Loan Documents (a) are and shall be true, correct, and complete in all material respects at the time they were made and as of the execution of this Agreement, (b) do not and shall not contain any untrue statement of a material fact, and (c) do not and shall not omit to state a material fact necessary to make the information in them neither misleading nor incomplete. Borrower understands that all such statements, representations, and warranties shall be deemed to have been relied on by Lender as a material inducement to make the Loan.

**3.8.** **Policies of Insurance.** Each copy of the insurance policies relating to the Collateral delivered to Lender by Borrower (a) is a true, correct, and complete copy of the respective original policy in effect on the date of this Agreement, and no amendments or modifications of said documents or instruments not included in such copies have been made, and (b) has not been terminated and is in full force and effect. Borrower is not in default in the observance or performance of its material obligations under said documents or instruments and Borrower has done all things required to be done as of the date of this Agreement to keep unimpaired its rights thereunder.

**3.9.** **Financial Statements.** All financial statements furnished to Lender are true and correct in all material respects, are prepared in accordance with generally accepted accounting principles, and do not omit any material fact the omission of which makes such statement or statements misleading. There are no facts that have not been disclosed to Lender by Borrower in writing that materially or adversely affect or could potentially in the future affect the Collateral or the business prospects, profits, or condition (financial or otherwise) of Borrower or any Guarantor or Borrower's abilities to perform the Secured Obligations and pay the Indebtedness.

**3.10.** **Taxes.** Borrower has filed or caused to be filed all tax returns that are required to be filed by Borrower under the Governmental Requirements of each Governmental Authority with taxing power over Borrower, and Borrower has paid, or made provision for the payment of, all taxes, assessments, fees, Impositions (as defined in the Security Instrument), and other governmental charges that have or may have become due under said returns, or otherwise, or under any assessment received by Borrower except that such taxes, if any, as are being contested in good faith and as to which adequate reserves (determined in accordance with generally accepted accounting principles) have been provided.

**3.11.** **Further Acts.** Borrower shall, at its sole cost and expense, and without expense to Lender, do, execute, acknowledge, and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers, and assurances as Lender shall from time to time

6

Val-Chris00181

require, for the purpose of better assuring, conveying, assigning, transferring, pledging, mortgaging, warranting, and confirming to Lender the Collateral and rights, and as to Lender the security interest, conveyed or assigned by this Agreement or intended now or later so to be, or for carrying out the intention or facilitating the performance of the terms of this Agreement, or for filing, registering, or recording this Agreement and, on demand, shall execute and deliver, and authorizes Lender to execute in the name of Borrower, to the extent it may lawfully do so, one or more financing statements, chattel mortgages, or comparable security instruments, to evidence more effectively the lien of Lender on the Collateral.

**3.12.** **Filing Fees.** Borrower shall pay all filing, registration, or recording fees, all Governmental Authority stamp taxes and other fees, taxes, duties, imposts, assessments, and all other charges incident to, arising from, or in connection with the preparation, execution, delivery, and enforcement of the Note, this Agreement, the other Loan Documents, or any instrument of further assurance.

**3.13.** **Entity Compliance.** As long as any part of the Secured Obligation is owed by Borrower, Borrower, if a corporation, limited liability company, partnership, or trust shall do all things necessary to preserve and keep in full force and effect its existence, franchises, rights, and privileges as such entity under the laws of the state of its incorporation or formation, and shall comply with all Governmental Requirements of any Governmental Authority applicable to Borrower or to any Collateral or any part of it, and Borrower shall qualify and remain in good standing in each jurisdiction where it is required to be so under any applicable Governmental Requirement.

**3.14.** **Improper Financial Transactions.**

**3.14.1.** Borrower is, and shall remain at all times, in full compliance with all applicable laws and regulations of the United States of America that prohibit, regulate or restrict financial transactions, and any amendments or successors thereto and any applicable regulations promulgated thereunder (collectively, the "Financial Control Laws"), including but not limited to those related to money laundering offenses and related compliance and reporting requirements (including any money laundering offenses prohibited under the Money Laundering Control Act, 18 U.S.C. Section 1956 and 1957 and the Bank Secrecy Act, 31 U.S.C. Sections 5311 et seq.) and the Foreign Assets Control Regulations, 31 C.F.R. Section 500 et seq.

**3.14.2.** Borrower represents and warrants that: Borrower is not a Barred Person (hereinafter defined); Borrower is not owned or controlled, directly or indirectly, by any Barred Person; and Borrower is not acting, directly or indirectly, for or on behalf of any Barred Person.

**3.14.3.** Borrower represents and warrants that it understands and has been advised by legal counsel on the requirements of the Financial Control Laws.

**3.14.4.** Under any provision of the Loan Documents where Lender shall have the right to approve or consent to any particular action, including, without limitation any (A) sale, transfer, assignment of any Collateral, or any direct or indirect ownership interest in Borrower, (B) leasing of any Collateral, or any portion thereof, or (C) incurring any additional financing secured by the Collateral, or any portion thereof, or by any direct or indirect ownership interest in Borrower, Lender shall have the right to withhold such approval or consent, in its sole discretion.

**3.14.5.** Borrower covenants and agrees that it will upon request provide Lender with (or cooperate with Lender in obtaining) information required by Lender for purposes of complying with any Financial Control Laws. As used in this Agreement, the term "Barred Person" shall mean (A) any person, group or entity named as a "Specially Designated National and Blocked Person" or as a person who commits, threatens to commit, supports, or is associated with terrorism as designated by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC"), (B) any person, group or entity named in the lists maintained by the United States Department of Commerce (Denied Persons and Entities), (C) any government or citizen of any country that is subject to a United States Embargo identified in regulations promulgated by OFAC, and (D) any person, group or entity named as a denied or blocked person or terrorist in any other list maintained by any agency of the United States government.

7

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement          Loan No. 20047

v188

Borrower's Initials:

Val-Chris00182

**3.15. Representation on Use of Proceeds.** Borrower represents and warrants to Lender that the proceeds of the Loan will be used solely for business, commercial investment, or similar purposes, and that no portion of it will be used for personal, family, or household purposes.

**3.16. Made or Arranged by a Real Estate Broker.** Borrower acknowledges that this Loan was made or arranged by a licensed California Real Estate Broker and that the licensee's participation was a material factor in consummating this Loan.

**3.17. Made or Arranged by a California Finance Lender.** Borrower acknowledges that this Loan was made or arranged by a licensed California Finance Lender and that the licensee's participation was a material factor in consummating this Loan.

**3.18. Brokerage Fees.** Borrower represents and warrants to Lender that Borrower has not dealt with any Person, other than the parties identified in the final settlement statement, who are or may be entitled to any finder's fee, brokerage commission, loan commission, or other sum in connection with the execution of the Loan Documents, the consummation of the transactions contemplated by the Loan Documents, or the making of the Loan by Lender to Borrower, and Borrower indemnifies and agrees to hold Lender harmless from and against any and all loss, liability, or expense, including court costs and Attorneys' Fees, that Lender may suffer or sustain if such warranty or representation proves inaccurate in whole or in part. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**3.19. Perfection and Priority of Security Interest.** Borrower represents and warrants that unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any security agreements, or permitted the filing or attachment of any security interests on or affecting any of the Collateral directly or indirectly securing repayment of the Loan, that would be prior or that may in any way be superior to Lender's security interests and rights in and to the Collateral.

**3.20. Title to Property.** Borrower represents and warrants that Borrower is the sole owner of and has good marketable title to the fee interest in the Collateral, free from any lien or encumbrance of any kind whatsoever.

**4. INSURANCE.** Lender's obligation to make the Loan and perform its duties under this Agreement shall be subject to the full and complete satisfaction of the following conditions precedent:

**4.1. Casualty Insurance.** Borrower shall at all times keep the Collateral insured for the benefit of Lender as follows, despite Governmental Requirements that may detrimentally affect Borrower's ability to obtain or may materially increase the cost of such insurance coverage:

**4.1.1.** Against damage or loss by fire and such other hazards (including lightning, windstorm, hail, explosion, riot, acts of striking employees, civil commotion, vandalism, malicious mischief, aircraft, vehicle, and smoke) as are covered by the broadest form of extended coverage endorsement available from time to time, in an amount not less than the Full Insurable Value (as defined below) of the Collateral, with a deductible amount not to exceed an amount satisfactory to Lender; windstorm coverage is included under the extended coverage endorsement of most hazard policies, but in some states it may be excluded. If the hazard policy excludes the windstorm/hail endorsement a separate windstorm policy must be provided. The coverage amounts must equal that of the hazard policy;

**4.1.2.** Rent loss or business interruption or use and occupancy insurance on such basis and in such amounts and with such deductibles as are satisfactory to Lender;

**4.1.3.** Against damage or loss by flood if the Collateral is located in an area identified by the Secretary of Housing and Urban Development or any successor or other appropriate authority (governmental or private) as an area having special flood hazards and in which flood insurance is available under the National Flood Insurance Act of 1968 or the Flood Disaster Protection Act of 1973, as amended, modified, supplemented, or replaced from time to time, on such basis and in such amounts as Lender may require;

---

8

Val-Chris00183

**4.1.4.** Against damage or loss from (a) sprinkler system leakage and (b) boilers, boiler tanks, heating and air conditioning equipment, pressure vessels, auxiliary piping, and similar apparatus, on such basis and in such amounts as Lender may require;

**4.1.5.** During any alteration, construction, or replacement of Improvements, or any substantial portion of it, a Builder's All Risk policy with extended coverage with course of construction and completed value endorsements and such other endorsements as may be required by Lender, including stipulations that coverage will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender, for an amount at least equal to the Full Insurable Value of the Improvements, and workers' compensation, in statutory amounts, with provision for replacement with the coverage described herein, without gaps or lapsed coverage, for any completed portion of the Improvements; and

**4.1.6.** If applicable, against damage or loss by earthquake, in an amount and with a deductible satisfactory to Lender, if such insurance is required by Lender in the exercise of its business judgment in light of the commercial real estate practices existing at the time the insurance is issued and in the County where the Collateral is located.

**4.2.** **Liability Insurance.** Borrower shall procure and maintain workers' compensation insurance for Borrower's employees, public liability and comprehensive general liability insurance (owner's and if required by Lender, general contractor's) covering Borrower, and Lender against claims for bodily injury or death or for damage occurring in, on, about, or resulting from the Real Property Collateral, or any street, drive, sidewalk, curb, or passageway adjacent to it, in standard form and with such insurance company or companies and in an amount of at least as Lender may require, which insurance shall include completed operations, product liability, and blanket contractual liability coverage that insures contractual liability under the indemnifications set forth in this Agreement and the Loan Documents (but such coverage or its amount shall in no way limit such indemnification).

**4.3.** **Other Insurance.** Borrower shall procure and maintain such other insurance or such additional amounts of insurance, covering Borrower or the Collateral, as (a) may be required by the terms of any construction contract for construction on the Collateral or by any Governmental Authority, (b) may be specified in any other Loan Documents, or (c) may be required by Lender from time to time.

**4.4.** **Form of Policies.** All insurance policies required under this Section shall be fully paid for and nonassessable. The policies shall contain such provisions, endorsements, and expiration dates as Lender from time to time reasonably requests and shall be in such form and amounts, and be issued by such insurance companies doing business in the State where the Collateral is located, as Lender shall approve in Lender's sole and absolute discretion. Unless otherwise expressly approved in writing by Lender, each insurer shall have a claims-paying or financial strength rating that satisfies the Insurance Rating Requirements. (All policies shall (a) contain a waiver of subrogation endorsement; (b) provide that the policy will not lapse or be canceled, amended, or materially altered (including by reduction in the scope or limits of coverage) without at least 30 days prior written notice to Lender; (c) with the exception of the comprehensive general liability policy, contain a mortgagee's endorsement (438 BFU Endorsement or equivalent), and name Lender as insured; and (d) include such deductibles as Lender may approve. If a policy required under this Section contains a co-insurance or overage clause, the policy shall include a stipulated value or agreed amount endorsement acceptable to Lender.

**4.5.** **Duplicate Originals or Certificates.** Duplicate original policies evidencing the insurance required herein and any additional insurance that may be purchased on the Collateral by or on behalf of Borrower shall be deposited with and held by Lender and, in addition, Borrower shall deliver to Lender (a) receipts evidencing payment of all premiums on the policies and (b) duplicate original renewal policies or a binder with evidence satisfactory to Lender of payment of all premiums at least 30 days before the policy expires. In lieu of the duplicate original policies to be delivered to Lender provided for herein, Borrower may deliver an underlier of any blanket policy, and Borrower may also deliver original certificates from the issuing insurance company, evidencing that such policies are in full force and effect and containing information

---

9

Val-Chris00184

that, in Lender's reasonable judgment, is sufficient to allow Lender to ascertain whether such policies comply with the requirements herein.

**4.6.** **Increased Coverage.** If Lender determines that the limits of any insurance carried by Borrower are inadequate or that additional coverage is required, Borrower shall, within 10 days after written notice from Lender, procure such additional coverage as Lender may require in Lender's sole and absolute discretion.

**4.7.** **No Separate Insurance.** Borrower shall not carry separate or additional insurance concurrent in form or contributing in the event of loss with that required herein unless endorsed in favor of Lender as required by this Section and otherwise approved by Lender in all respects.

**4.8.** **Transfer of Title.** In the event of foreclosure of any Collateral or other transfer of title or assignment of any Collateral in extinguishment, in whole or in part, of the Secured Obligations and the Indebtedness, all right, title, and interest of Borrower in and to all insurance policies required herein or otherwise then in force with respect to the Collateral and all proceeds payable under, and unearned premiums on, such policies shall immediately vest in the purchaser or other transferee of the Collateral.

**4.9.** **Replacement Cost.** For purposes of this Agreement, the term "Full Insurable Value" means the actual cost of replacing the Collateral in question, without allowance for depreciation, as calculated from time to time (but not more often than once every calendar year) by the insurance company or companies holding such insurance or, at Lender's request, by appraisal made by an appraiser, engineer, architect, or contractor proposed by Borrower and approved by said insurance company or companies and Lender. Borrower shall pay the cost of such appraisal.

**4.10.** **No Warranty.** No approval by Lender of any insurer may be construed to be a representation, certification, or warranty of its solvency and no approval by Lender as to the amount, type, or form of any insurance may be construed to be a representation, certification, or warranty of its sufficiency.

**4.11.** **Lender's Right to Obtain.** Borrower shall deliver to Lender original policies or certificates evidencing such insurance at least 30 days before the existing policies expire. If any such policy is not so delivered to Lender or if any such policy is canceled, whether or not Lender has the policy in its possession, and no reinstatement or replacement policy is received before termination of insurance, Lender, without notice to or demand on Borrower, may (but is not obligated to) obtain such insurance insuring only Lender with such company as Lender may deem satisfactory, and pay the premium for such policies, and the amount of any premium so paid shall be charged to and promptly paid by Borrower or, at Lender's option, may be added to the Indebtedness. Borrower acknowledges that, if Lender obtains insurance, it is for the sole benefit of Lender, and Borrower shall not rely on any insurance obtained by Lender to protect Borrower in any way.

**4.12.** **Duty to Restore After Casualty.** If any act or occurrence of any kind or nature (including any casualty for which insurance was not obtained or obtainable) results in damage to or loss or destruction of the Collateral, Borrower shall immediately give notice of such loss or damage to Lender and, if Lender so instructs, shall promptly, at Borrower's sole cost and expense, regardless of whether any insurance proceeds will be sufficient for the purpose, commence and continue diligently to completion to restore, repair, replace, and rebuild the Collateral as nearly as possible to its value, condition, and character immediately before the damage, loss, or destruction.

## 5. BORROWER COVENANTS AND REPORTING REQUIREMENTS.

### 5.1. Financial Statements.

**5.1.1.** **Borrower's Financial Statements.** Borrower shall furnish to Lender the following on receipt of Lender's written request and without expense to Lender: (a) an annual statement of the operation of the Real Property Collateral prepared and certified by Borrower and any Tenant Affiliate, showing in reasonable detail satisfactory to Lender total Rents (as defined in the Security Instrument) received and total expenses together with an annual balance sheet and profit and loss statement, within 90 days after the

10

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00185

close of each fiscal year of Borrower and any Tenant Affiliate, beginning with the fiscal year first ending after the date of recordation of the Security Instrument; (b) within 30 days after the end of each calendar quarter (March 31, June 30, September 30, December 31) interim statements of the operation of the Real Property Collateral showing in reasonable detail satisfactory to Lender total Rents and other income and receipts received and total expenses for the previous quarter, certified by Borrower; and (c) copies of Borrower's and any Tenant Affiliate's annual state and federal income tax returns within 30 days after filing them. Borrower shall keep accurate books and records, and allow Lender, its representatives and agents, on notice, at any time during normal business hours, access to such books and records regarding acquisition, construction, development, and operations of the Real Property Collateral, including any supporting or related vouchers or papers, shall allow Lender to make extracts or copies of any such papers, and shall furnish to Lender and its agents convenient facilities for the audit of any such statements, books, and records.

    **5.1.2. Recordkeeping.** Borrower shall keep adequate records and books of account in accordance with generally accepted accounting principles and practices applied consistently throughout the period reported and shall permit Lender, by its agents, accountants, and attorneys, to examine Borrower's records and books of account and to discuss the affairs, finances, and accounts of Borrower with the officers of Borrower, at such reasonable times as Lender may request.

    **5.1.3. Additional Financial Statements.** Except to the extent already required herein, Borrower, its controlling shareholders, all Tenant Affiliates and all Guarantors of the Indebtedness, if any, shall deliver to Lender with reasonable promptness after the close of their respective fiscal years a balance sheet and profit and loss statement, prepared by the principal of the Borrower or an independent certified public accountant satisfactory to Lender, setting forth in each case, in comparative form, figures for the preceding year, which statements shall be accompanied by the unqualified opinion of the principal of the Borrower or such accountant as to their accuracy. Throughout the term of the Loan, Borrower, any Tenant Affiliate and any Guarantor shall deliver, with reasonable promptness, to Lender such other information with respect to Borrower, Tenant Affiliate or Guarantor as Lender may from time to time request. All financial statements of Borrower, Tenant Affiliate or Guarantor shall be prepared using reasonably accepted accounting practices applied on a consistent basis and shall be delivered in duplicate. Documents and information submitted by Borrower to Lender are submitted confidentially, and Lender shall not disclose them to third parties and shall limit access to them to what is necessary to service the Loan, accomplish the normal administrative, accounting, tax-reporting, and other necessary functions, to sell all or any part of the Loan and to report such information as required to the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Internal Revenue Service, and similar entities.

    **5.1.4. No Waiver of Default or Rights.** Lender's exercise of any right or remedy provided for herein shall not constitute a waiver of, or operate to cure, any default by Borrower under this Agreement, or preclude any other right or remedy that is otherwise available to Lender under this Agreement or Governmental Requirements.

**5.2. Borrower's Obligation to Notify Lender.**

    **5.2.1. Bankruptcy, Insolvency, Transfer, or Encumbrance.** Borrower shall notify Lender in writing, at or before the time of the occurrence of any Event of Default, of such event and shall promptly furnish Lender with any and all information on such event that Lender may request.

    **5.2.2. Government Notice.** Borrower shall give immediate written notice to Lender of any notice, proceeding or inquiry by any Governmental Authority. Borrower shall provide such notice to Lender within five (5) days of Borrower's knowledge, constructive or actual, of any such notice, proceeding or inquiry by any Government Authority.

**5.3. Funds for Taxes, Insurance, and other Impositions.** If Borrower is in default under this Agreement or any of the Loan Documents, regardless of whether the default has been cured, then Lender may at any subsequent time, at its option to be exercised on 30 days written notice to Borrower, require Borrower to deposit with Lender or its designee, at the time of each payment of an installment of interest

---

11

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement      Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00186

or principal under the Note, an additional amount sufficient to discharge the Impositions (as defined in the Security Instrument) as they become due. The calculation of the amount payable and of the fractional part of it to be deposited with Lender shall be made by Lender in its sole and absolute discretion. These amounts shall be held by Lender or its designee not in trust and not as agent of Borrower and shall not bear interest, and shall be applied to the payment of any of the Impositions (as defined in the Security Instrument) under the Loan Documents in such order or priority as Lender shall determine. If at any time within 30 days before the due date of these obligations the amounts then on deposit shall be insufficient to pay the obligations under the Note and this Agreement in full, Borrower shall deposit the amount of the deficiency with Lender within 10 days after Lender's demand. If the amounts deposited are in excess of the actual obligations for which they were deposited, Lender may refund any such excess, or, at its option, may hold the excess in a reserve account, not in trust and not bearing interest, and reduce proportionately the required monthly deposits for the ensuing year. Nothing in this Section shall be deemed to affect any right or remedy of Lender under any other provision of this Agreement or under any statute or rule of law to pay any such amount and to add the amount so paid to the Indebtedness secured by the Security Instrument. Lender shall have no obligation to pay insurance premiums or taxes except to the extent the fund established under this Section is sufficient to pay such premiums or taxes, to obtain insurance, or to notify Borrower of any matters relative to the insurance or taxes for which the fund is established under this Section.

Lender or its designee shall hold all amounts so deposited as additional security for the sums secured by the Security Instrument. Lender may, in its sole and absolute discretion and without regard to the adequacy of its security under the Security Instrument, apply such amounts or any portion of it to any Indebtedness secured by the Security Instrument, and such application shall not be construed to cure or waive any default or notice of default under this Agreement, or any other Loan Document.

If Lender requires deposits to be made under this Section, Borrower shall deliver to Lender all tax bills, bond and assessment statements, statements for insurance premiums, and statements for any other obligations referred to above as soon as Borrower receives such documents.

If Lender sells or assigns the Loan, Lender shall have the right to transfer all amounts deposited under this Section to the purchaser or assignee. After such a transfer, Lender shall be relieved and have no further liability under this Agreement for the application of such deposits, and Borrower shall look solely to such purchaser or assignee for such application and for all responsibility relating to such deposits.

**5.4.    Compliance with Law.** Borrower shall: (a) maintain a yearly accounting cycle; (b) maintain in full force and effect all material licenses, permits, governmental authorizations, bonds, franchises, leases, trademarks, patents, contracts, and other rights necessary or desirable to the conduct of its business, or related to the Collateral; (c) continue in, and limit its operations to, substantially the same general lines of business as those presently conducted by it; (d) pay when due all taxes, license fees, and other charges upon the Collateral or upon Borrower's business, property or the income therefrom; and (e) comply with all Governmental Requirements.

**5.5.    Care of Collateral.** Borrower shall: (a) keep the Collateral in good condition and repair; (b) restore and repair to the equivalent of its original condition all or any part of any Collateral that may be damaged or destroyed, whether or not insurance proceeds are available to cover any part of the cost of such restoration and repair, and regardless of whether Lender permits the use of any insurance proceeds to be used for restoration under this Agreement, Security Instrument, and Collateral Security Agreement; (c) comply with all laws affecting the Collateral or requiring that any alterations, repairs, replacements, or improvements be made thereon; (d) not commit or permit waste on or to any Collateral, or commit, suffer, or permit any act or violation of law to occur on it; (e) not abandon any Collateral; (f) notify Lender in writing of any condition of any Collateral that may have a significant and measurable effect on its market value; (g) do all other things that the character or use of the Collateral may reasonably render necessary to maintain it in the same condition (reasonable wear and tear expected) as existed at the date of this Agreement; (h) at all times warrant and defend Borrower's

---

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 20047

v188

Borrower's Initials:

Val-Chris00187

ownership and possession of the Collateral; and (i) keep the Collateral free from all liens, claims, encumbrances and security interests.

**5.6.    Transfer of Collateral.** Borrower will not, without obtaining the prior written consent of Lender, transfer or permit any transfer of any Collateral or any part thereof to be made, or any interest therein to be created by way of a sale (except as expressly permitted herein), or by way of a grant of a security interest, or by way of a levy or other judicial process.

**5.7.    Indemnify Lender.** Borrower shall indemnify and hold the Lender and its successors and assigns harmless from and against any and all losses, cost, expense (including, without limitation Attorneys' Fees, consulting fees and court costs), demand, claim or lawsuit arising out of or related to or in any way connected with or arising out of Borrower's breach of the provisions of this Agreement or any of the other Loan Documents. Lender may commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement, or the Collateral, and Borrower shall pay all of Lender's reasonable costs and expenses so incurred on demand. If Borrower fails to provide such indemnity as the same accrues and as expenses are incurred, the amount not paid shall be added to the principal amount of the Note and bear interest thereon at the same rate then in effect (including any default rate in effect) and shall be secured by the same collateral as securing the Note and Loan Documents.  This Section shall survive execution, delivery, performance, and termination of this Agreement and the other Loan Documents.

**5.8.    Estoppel Certificates.** Within 10 days after Lender's request for such information, Borrower shall execute and deliver to Lender, and to any third party designated by Lender, in recordable form, a certificate of the principal financial or accounting officer of Borrower ("Estoppel Certificate"), dated within 3 days after delivery of such statements, or the date of such request, as the case may be, reciting that the Loan Documents are unmodified and in full force and effect, or that the Loan Documents are in full force and effect as modified and specifying all modifications asserted by Borrower. Such certificate shall also recite the amount of the Indebtedness and cover other matters with respect to the Indebtedness or Secured Obligations as Lender may reasonably require, the date(s) through which payments due on the Indebtedness have been paid and the amount(s) of any payments previously made on the Indebtedness. The certificate shall include a detailed statement of any right of setoff, counterclaim, or other defense that Borrower contends exists against the Indebtedness or the Secured Obligations; a statement that such Person knows of no Event of Default or prospective Event of Default that has occurred and is continuing, or, if any Event of Default or prospective Event of Default has occurred and is continuing, a statement specifying the nature and period of its existence and what action Borrower has taken or proposes to take with respect to such matter; and, except as otherwise specified, a statement that Borrower has fulfilled all Secured Obligations that are required to be fulfilled on or before the date of such certificate.

**5.8.1.    Failure to Deliver Estoppel Certificate.** If Borrower fails to execute and deliver the Estoppel Certificate within such 10-day period, (a) the Loan Documents shall, as to Borrower, conclusively be deemed to be either in full force and effect, without modification, or in full force and effect, modified in the manner and to the extent specified by Lender, whichever Lender reasonably and in good faith may represent; (b) the Indebtedness shall, as to Borrower, conclusively be deemed to be in the amount specified by Lender and no setoffs, counterclaims, or other defenses exist against the Indebtedness; and (c) Borrower shall conclusively be deemed to have irrevocably constituted and appointed Lender as Borrower's special attorney-in-fact to execute and deliver such certificate to any third party.

**5.8.2.    Reliance on Estoppel Certificate.** Borrower and Lender expressly agree that any certificate executed and delivered by Borrower, or any representation in lieu of a certificate made by Lender as provided for above, may be relied on by any prospective purchaser or any prospective assignee of any interest of Lender in the Note and other Indebtedness secured by the Security Instrument or in the Real Property Collateral, and by any other Person, without independent investigation or examination, to verify the accuracy, reasonableness, or good faith of the recitals in the certificate or representation.

---

13

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00188

**5.9.** **Appraisal and Inspections.** In addition to any other right to require an appraisal or inspection of the Real Property Collateral provided in the Loan Documents, Lender may from time to time, at Borrower's expense, order an appraisal or inspection of any Real Property Collateral where:

**5.9.1.** There has been a change in any market conditions or other circumstances that in Lender's sole and absolute discretion would make a prior appraisal no longer accurate;

**5.9.2.** The occurrence of any fact or circumstance which in Lender's belief would alter the value or prior evaluated condition of any Real Property Collateral.

## 6. ENVIRONMENTAL MATTERS.

**6.1.** **Environmental Indemnity Agreement.** Concurrently with the execution of this Agreement, Borrower shall execute and deliver to Lender a separate Environmental Indemnity Agreement ("Environmental Indemnity") in form and substance satisfactory to Lender, pursuant to which Borrower will indemnify, defend, and hold Lender harmless from and against any and all losses, damages, claims, costs, and expenses incurred by Lender as a result of the existence or alleged existence of hazardous or toxic substances on, under, or about the Real Property Collateral in violation of Environmental Laws as provided in the Environmental Indemnity. The obligations of the Borrower under the Environmental Indemnity shall not be secured by the Security Instrument.

**6.2.** **Borrower's Representations and Warranties.** Borrower represents and warrants to Lender that each and every representation and warranty in the Environmental Indemnity (collectively "Environmental Representations") is true and correct.

**6.3.** **Survival of Representations and Warranties.** The Environmental Representations shall be continuing and shall be true and correct from the date of this Agreement. The provisions of this Section shall survive the expiration and termination of this Agreement and the repayment of the Indebtedness.

**6.4.** **Notice to Lender.** Borrower shall give prompt written notice to Lender of:

**6.4.1.** Any proceeding or inquiry by any Governmental Authority regarding the presence or threatened presence of any Hazardous Materials on the Real Property Collateral;

**6.4.2.** All claims made or threatened by any third party against Borrower or the Real Property Collateral relating to any loss or injury resulting from any Hazardous Materials;

**6.4.3.** Any notice given to Borrower under Environmental Laws; and

**6.4.4.** Discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Real Property Collateral that could cause it or any part of it to be subject to any restrictions on the ownership, occupancy, transferability, or use of the Real Property Collateral under any Environmental Laws.

**6.5.** **Lender's Right to Join Legal Actions.** Lender shall have the right, at its option, but at Borrower's sole cost and expense, to join and participate in, as a party if it so elects, any legal proceedings or actions initiated by or against Borrower or the Real Property Collateral in connection with any Environmental Laws.

## 7. DEFAULT AND REMEDIES.

**7.1.** **Event of Default.** The occurrence of any of the following events shall constitute an Event of Default under this Agreement:

**7.1.1.** **Payment of Indebtedness.** Borrower fails to pay any installment of interest and/or principal under the Note or any other Indebtedness when due and such failure continues for more than ten (10) days after the date such payment was due and payable whether on maturity, the date stipulated in any Loan Document, by acceleration, or otherwise.

**7.1.2.** **Performance of Obligations.** The failure, refusal, or neglect to perform and discharge fully and timely any of the Secured Obligations as and when required.

14

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement          Loan No. 20047

v188
Borrower's Initials: _____

Val-Chris00189

**7.1.3. Judgment.** If any final judgment, order, or decree is rendered against Borrower or a Guarantor and is not paid or executed on, or is not stayed by perfection of an appeal or other appropriate action, such as being bonded, or is not otherwise satisfied or disposed of to Lender's satisfaction within 30 days after entry of the judgment, order, or decree.

**7.1.4. Voluntary Bankruptcy.** If Borrower or its affiliates, or any Guarantor or its affiliates (a) seeks entry of an order for relief as a debtor in a proceeding under the Bankruptcy Code; (b) seeks, consents to, or does not contest the appointment of a receiver or trustee for itself or for all or any part of its property; (c) files a petition seeking relief under the bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or any other competent jurisdiction; (d) makes a general assignment for the benefit of its creditors; or (e) states in writing its inability to pay its debts as they mature.

**7.1.5. Involuntary Bankruptcy.** If (a) a petition is filed against Borrower or any Guarantor seeking relief under any bankruptcy, arrangement, reorganization, or other debtor relief laws of the United States or any state or other competent jurisdiction; or (b) a court of competent jurisdiction enters an order, judgment, or decree appointing, without the consent of Borrower or any Guarantor, a receiver or trustee for it, or for all or any part of its property; and (c) such petition, order, judgment, or decree is not discharged or stayed within 30 days after its entry.

**7.1.6. Foreclosure of Other Liens.** If the holder of any lien or security interest on the Collateral (without implying Lender's consent to the existence, placing, creating, or permitting of any lien or security interest) institutes foreclosure or other proceedings to enforce its remedies thereunder and any such proceedings are not stayed or discharged within 30 days after institution of such foreclosure proceedings.

**7.1.7. Sale, Encumbrance, or Other Transfer.** If Borrower (a) sells, gives an option to purchase, exchanges, assigns, conveys, encumbers (including, but not limited to PACE/HERO loans, any loans where payments are collected through property tax assessments, and super-voluntary liens which are deemed to have priority over the lien of the Security Instrument) (other than with a Permitted Encumbrance as defined in the Security Instrument), transfers possession, or alienates all or any portion of the Collateral, or any of Borrower's interest in the Collateral, or suffers its title to, or any interest in, the Collateral to be divested, whether voluntarily or involuntarily; or if there is a sale or transfer of any interests in Borrower; or if Borrower changes or permits to be changed the character or use of the Collateral, or drills or extracts or enters into any lease for the drilling or extracting of oil, gas, or other hydrocarbon substances or any mineral of any kind or character on the Real Property Collateral; or (b) if title to the Collateral becomes subject to any lien or charge, voluntary or involuntary, contractual or statutory, without Lender's prior written consent; or (c) if a junior voluntary or involuntary deed of trust or mortgage lien in favor of another lender encumbers the Real Property Collateral (other than a Permitted Encumbrance) without Lender's express prior written consent thereto, which consent may be withheld in Lender's sole and absolute discretion, then Lender, at Lender's option, may, without prior notice and subject to Applicable Law, declare all sums secured by the Security Instrument, regardless of their stated due date(s), immediately due and payable and may exercise all rights and remedies in the Loan Documents.

**7.1.8. Title and Lien Priority.** If Borrower's, or any other pledgor of Collateral, as applicable, title to any or all of the Collateral or Lender's security interest on the Collateral or the status of Lender's lien as a lien and security interest in the priority position indicated in any Security Agreement on any Collateral is endangered in any manner, and Borrower fails to cure the same on Lender's demand.

**7.1.9. Other Defaults.** The occurrence of an Event of Default or any default, as defined or described in the other Loan Documents, or the occurrence of a default on any Indebtedness or Secured Obligations.

**7.1.10. Levy on Assets.** A levy on any of the assets of Borrower or any Guarantor, and such levy is not stayed or abated within 30 days after such levy.

**7.1.11. Breach of Representations.** The breach of any representation, warranty, or covenant in this Agreement or other Loan Documents.

15

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00190

**7.1.12. Default Under Prior Security Instrument, or Lien.** The failure to pay on a timely basis, or the occurrence of any other default under any note, deed of trust, contract of sale, lien, charge, encumbrance, or security interest encumbering or affecting the Collateral and having priority over the lien of Lender.

**7.1.13. Materially Adverse Event.** The occurrence of any event that in Lender's judgment materially adversely affects (i) the ability of Borrower to perform any of its obligations under this Agreement or under any of the Loan Documents, including, without limitation, the occurrence of any event of dissolution or termination of Borrower, of any member of Borrower, or of any Guarantor; (ii) the business or financial condition of Borrower, or of any member of Borrower, or of any Guarantor; or (iii) the operation or value of the Collateral.

**7.1.14. Violation of Governmental Requirements.** The failure of Borrower, any tenant, or any other occupant of the Real Property Collateral to comply with any Governmental Requirement. Any potential violation by a tenant or other occupant of the Real Property Collateral of any Governmental Requirement is an Event of Default under the terms of this Agreement; and upon the occurrence of any such violation, Lender, at Lender's option, may, without prior notice, declare all Indebtedness, regardless of the stated due date(s), immediately due and payable and may exercise all rights and remedies in this Agreement, and any other Loan Documents.

**7.2.     Remedies.** On the occurrence of an Event of Default, Lender may, in addition to any other remedies that Lender may have under this Agreement or under the Loan Documents or by law, at its option and without prior demand or notice, take any or all of the following actions:

**7.2.1.** The Lender may, without prejudice to any of its other rights under any Loan Document or by Applicable Law, declare all Secured Obligations to be immediately due and payable without presentment, notice of intent to accelerate, representation, demand of payment or protest, which are hereby expressly waived.

**7.2.2.** The obligation of the Lender, if any, to make additional disbursements, advances (including Construction Disbursements), loans or financial accommodations of any kind to the Borrower shall immediately terminate upon the occurrence of an Event of Default.

**7.2.3.** If an Event of Default shall have occurred and be continuing, the Lender may exercise any remedy provided by any or all Security Agreements. In addition, the Lender may exercise in respect of any Collateral, in addition to other rights and remedies provided for herein (or in any Loan Document) or otherwise available to it, all the rights and remedies of a secured party under the applicable Uniform Commercial Code (the "Code") whether or not the Code applies to the affected Collateral, and also may (i) require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place to be designated by the Lender that is reasonably convenient to both parties and (ii) without notice except as specified below or by Applicable Law, sell the Collateral or any part thereof in one or more lots at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit, or for future delivery, and upon such other terms as the Lender may deem commercially reasonable. Borrower agrees that, to the extent notice of sale shall be required by law, at least ten (10) days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification. The Lender shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefore, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

**7.2.4.** Unless otherwise required by Applicable Law, all cash proceeds received by the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, or then or at any time thereafter applied in whole or in part by the Lender against all or any part of the Secured Obligations in such

---

16

Val-Chris00191

order as the Lender shall elect. Any surplus of such cash or cash proceeds held by the Lender and remaining after the full, and final payment of all the Secured Obligations shall be paid over to the Borrower or to such other Person to which the Lender may be required under Applicable Law, or directed by a court of competent jurisdiction, to make payment of such surplus.

**7.3.** **Rights and Remedies Cumulative.** All rights and remedies provided for herein or in any other Loan Document are not exclusive, each shall be cumulative and in addition to any and all other rights and remedies existing at law or in equity, and all such remedies shall survive the acceleration of one or more of the Notes. Lender's exercise or partial exercise of, or failure to exercise, any remedy shall not restrict Lender from further exercise of that remedy or any other available remedy. No extension of time for payment or performance of any obligation shall operate to release discharge, modify, change or affect the original liability of Borrower for any obligations, either in whole or in part.

**7.4.** **Waiver of Marshalling.** Despite the existence of interests in the Collateral other than that created by the Security Agreements, and despite any other provision of this Agreement, if Borrower defaults in paying the Indebtedness or in performing any Secured Obligations, Lender shall have the right, in Lender's sole and absolute discretion, to establish the order in which the Collateral will be subjected to the remedies provided in this Agreement and Security Agreement and to establish the order in which all or any part of the Indebtedness secured by the Security Agreement is satisfied from the proceeds realized on the exercise of the remedies provided in the Security Agreement. Borrower and any Person who now has or later acquires any interest in the Collateral with actual or constructive notice of this Agreement and/or any Security Agreement waives any and all rights to require a marshaling of assets in connection with the exercise of any of the remedies provided in this Agreement, any Security Agreement or otherwise provided by Governmental Requirements.

**7.5.** **Limitations on Borrower During Cure Period.** For any period during which Borrower has an opportunity to cure an Event of Default in accordance with this Agreement, the Note, the Security Agreement or any other Loan Document, Borrower shall not (a) make any distributions to its members and (b) make any expenditures outside the ordinary course of business, except to cure a Default of this Agreement, the Note, the Security Agreement or any other Loan Document.

**7.6.** **Limitation of Liability.** No claim may be made by Borrower, or any other Person against Lender or its affiliates, directors, officers, employees, attorneys or agents of any of such Persons for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection therewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, and waives the damages themselves, whether or not accrued and whether or not known or suspected to exist in its favor.

## 8. GENERAL TERMS.

**8.1.** **No Waiver by Lender.** No waiver by Lender of any right or remedy provided by the Loan Documents or Governmental Requirements shall be effective unless such waiver is in writing and signed by authorized officer(s) of Lender. Waiver by Lender of any right or remedy granted to Lender under the Loan Documents or Governmental Requirements as to any transaction or occurrence shall not be deemed a waiver of any future transaction or occurrence. The acceptance of payment of any sum secured by the Collateral after its due date, or the payment by Lender of any Indebtedness or the performance by Lender of any Secured Obligations of Borrower under the Loan Documents, on Borrower's failure to do so, or the addition of any payment so made by Lender to the Indebtedness secured by the Collateral, or the exercise of Lender's right to enter the Real Property Collateral and receive and collect the Rents from it, or the assertion by Lender of any other right or remedy under the Loan Documents, shall not constitute a waiver of Lender's right to require prompt performance of all other Secured Obligations of Borrower under the Loan Documents and payment of the Indebtedness, or to exercise any other right or remedy under the Loan

---

17

Val-Chris00192

Documents for any failure by Borrower to timely and fully pay the Indebtedness and perform its Secured Obligations under the Loan Documents. Lender may waive any right or remedy under the Loan Documents or Governmental Requirements without notice to or consent from Borrower, any Guarantor of the Indebtedness and of the Secured Obligations under the Loan Documents, or any holder or claimant of a lien or other interest in the Collateral that is junior to the lien of Lender, and without incurring liability to Borrower or any other Person by so doing.

**8.2.** **Successors and Assigns.** This Agreement is made and entered into for the sole protection and benefit of Lender and Borrower and their successors and assigns, and no other Person or Persons shall have any right of action under this Agreement. The terms of this Agreement shall inure to the benefit of the successors and assigns of the parties, provided, however, that the Borrower's interest under this Agreement cannot be assigned or otherwise transferred without the prior consent of Lender. Lender in its sole discretion may transfer this Agreement, and may sell or assign participations or other interests in all or any part of this Agreement, all without notice to or the consent of Borrower.

**8.3.** **Notice.** Except for any notice required by Governmental Requirements to be given in another manner, (a) all notices required or permitted by the Loan Documents shall be in writing; (b) each notice shall be sent (i) for personal delivery by a delivery service that provides a record of the date of delivery, the individual to whom delivery was made, and the address where delivery was made; (ii) by certified United States mail, postage prepaid, return receipt requested; or (iii) by nationally recognized overnight delivery service, marked for next-business-day delivery; and (c) all notices shall be addressed to the appropriate party at its address as follows or such other addresses as may be designated by notice given in compliance with this provision:

|  |  |
|---|---|
| Lender: | Val-Chris Investments Inc |
|  | 2601 Main Street, Suite 400 |
|  | Irvine, California 92614 |
|  |  |
| Borrower: | Daniel P. Higgins |
|  | 2130 Winding Springs Drive |
|  | League City, Texas 77573 |

Notices will be deemed effective on the earliest of (a) actual receipt; (b) rejection of delivery; or (c) if sent by certified mail, the third day on which regular United States mail delivery service is provided after the day of mailing or, if sent by overnight delivery service, on the next day on which such service makes next-business-day deliveries after the day of sending.

To the extent permitted by Governmental Requirements, if there is more than one Borrower, notice to any Borrower shall constitute notice to all Borrowers. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address(es).

**8.4.** **Authority to File Notices.** Borrower irrevocably appoints, designates, and authorizes Lender as its agent (this agency being coupled with an interest) to file or send to any third party any notice or documents or take any other action that Lender reasonably deems necessary or desirable to protect its interest under this Agreement, or under the Loan Documents, and will on request by Lender, execute such additional documents as Lender may require to further evidence the grant of this right to Lender.

**8.5.** **Attorney-in-Fact.** Borrower irrevocably appoints Lender its true and lawful attorney-in-fact, which appointment is coupled with an interest, for purposes of accomplishing any of the foregoing. Borrower further nominates and appoints Lender as attorney-in-fact to perform all acts and execute all documents deemed necessary by Lender in furtherance of the terms of this Agreement; except, however, for receiving notice on behalf of Borrower.

**8.6.** **Time.** Time is of the essence in the Loan Documents.

---

18

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement          Loan No. 20047

Val-Chris00193

**8.7.** **Amendments, Termination, Waiver**. No amendment, supplement, termination, or waiver of any provision of this Agreement or of any of the Loan Documents, nor consent to any departure by Borrower from the terms of this Agreement or of any of the other Loan Documents, shall be effective unless it is in writing and signed by Lender and Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

**8.8.** **Headings**. The article, section and paragraph headings in this Agreement are for reference only and in no way define, limit, extend, or interpret the scope of this Agreement or of any particular article or section.

**8.9.** **Validity**. If any provision of this Agreement is held to be invalid, that holding shall not affect in any respect the validity of the remainder of this Agreement.

**8.10.** **Cross-Default**. Any default under the terms of any loan agreement, promissory note, deed of trust, mortgage, lease, conditional sale contract or other agreement, document or instrument evidencing, governing or securing any indebtedness owing by Borrower or any Affiliate of Borrower to Lender or any Affiliate of Lender; shall, at Lender's option, constitute an Event of Default under this Agreement. Notwithstanding anything contained in the Loan Documents to the contrary, any Loan sold, participated, or otherwise transferred to a third party shall not be cross-defaulted or cross-collateralized with any other loan not sold or transferred to the same third party. The following definitions shall apply to this Section:

> "**Affiliate**" means, with respect to any Person, any other Person that is directly or indirectly Controlling, Controlled by or under common Control with, such Person.

> "**Control**" and derivative terms means the possession, directly or indirectly, and acting either alone or together with others, of the power or authority to direct or cause the direction of the management, material policies, material business decisions or the affairs of a Person, whether through the ownership of equity securities or interests, by contract or other means.

> "**Person**" means any natural person, business, corporation, company, and or association, limited liability company, partnership, limited partnership, limited liability partnership, joint venture, business enterprise, trust, government authority or other legal entity.

BORROWER'S INITIALS:

**8.11.** **Survival of Warranties**. All agreements, representations, and warranties made in this Agreement shall survive the execution and delivery of this Agreement, of the Loan Documents, and the making of the Loan under this Agreement and continue in full force and effect until the Secured Obligations have been fully paid and satisfied.

**8.12.** **Attorney Fees**. Borrower agrees to pay the following costs, expenses, and Attorneys' Fees paid or incurred by Lender, or adjudged by a court: (a) reasonable costs of collection and costs, expenses, and Attorneys' Fees paid or incurred in connection with the collection or enforcement of the Loan Documents, whether or not suit is filed; (b) reasonable costs, expenses, and Attorneys' Fees paid or incurred in connection with representing Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under the Loan Documents; (c) reasonable costs, expenses, and Attorneys' Fees incurred to protect the lien of the Security Instrument; and (d) costs of suit and such sum as the court may adjudge as Attorneys' Fees in any action to enforce payment of the Loan Documents or any part of it.

In addition to the aforementioned fees, costs, and expenses, Lender in any lawsuit or other dispute shall be entitled to its Attorneys' Fees, and all other fees, costs, and expenses incurred in any

19

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 20047

Val-Chris00194

post-judgment proceedings to collect or enforce any judgment. This provision for the recovery of post-judgment fees, costs, and expenses is separate and several and shall survive the merger of the Loan Documents into any judgment on the Loan Agreement, Note, Guaranty, Security Instrument, or any other Loan Documents.

**8.13.** **Governing Law; Consent to Jurisdiction and Venue**. This Agreement is made by Lender and accepted by Borrower in the State of California, except that at all times the provisions for the creation, perfection, priority, enforcement and foreclosure of the liens and security interests created in the Real Property Collateral under the Loan Documents shall be governed by and construed according to the laws of the state in which each Real Property Collateral is situated. To the fullest extent permitted by the law of the state in which each Real Property Collateral is situated, the law of the State of California shall govern the validity and enforceability of all Loan Documents, and the debt or obligations arising hereunder (but the foregoing shall not be construed to limit Lender's rights with respect to such security interest created in the state in which each Real Property Collateral is situated). The parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Real Property Collateral, shall be Orange County, California, or the applicable federal district court that covers said County, and Borrower submits to personal jurisdiction in that forum for any and all purposes. Borrower waives any right Borrower may have to assert the doctrine of forum non conveniens or to object to such venue.

BORROWER'S INITIALS: _CB_

**8.14.** **Legal Relationships**. The relationship between Borrower and Lender is that of lender and borrower, and no partnership, joint venture, or other similar relationship shall be inferred from this Agreement. Borrower shall not have the right or authority to make representations, to act, or to incur debts or liabilities on behalf of Lender. Borrower is not executing this Agreement as an agent or nominee for an undisclosed principal, and no third-party beneficiaries are or shall be created by the execution of this Agreement.

**8.15.** **Dispute Resolution; Waiver of Right to Jury Trial**.

**8.15.1. ARBITRATION.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO ARBITRATE ANY DISPUTES TO RESOLVE ANY CLAIMS (AS DEFINED IN THE ARBITRATION AGREEMENT).

**8.15.2. WAIVER OF RIGHT TO JURY TRIAL.** CONCURRENTLY HEREWITH, BORROWER AND ANY GUARANTOR SHALL EXECUTE THAT CERTAIN ARBITRATION AGREEMENT AND WAIVER OF RIGHT TO JURY TRIAL WHEREBY BORROWER, ANY GUARANTOR, AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM (AS DEFINED IN THE ARBITRATION AGREEMENT) OR CAUSE OF ACTION BASED ON OR ARISING FROM THE LOAN.

BORROWER'S INITIALS: _CB_

**8.16.** **Counterparts**. This Agreement may be signed in one or more counterparts, each of which shall be deemed an original. This Agreement shall be deemed fully executed and effective when all Parties have executed at least one of the counterparts, even though no single counterpart bears all such signatures.

**8.17.** **Severability.** If any provision of the Loan Documents, or the application of them to the circumstances, is held void, invalid, or unenforceable by a court of competent jurisdiction, the Loan Documents, and the applications of such provision to other parties or circumstances, shall not be affected thereby, the provisions of the Loan Documents being severable in any such instance.

**8.18.** **Cooperation.** Borrower acknowledges that Lender and its successors and assigns may (a) sell, transfer, or assign the Loan Documents to one or more investors as a whole loan, in a rated or unrated public

20

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement        Loan No. 20047

v188

Borrower's Initials: _CB_

Val-Chris00195

offering or private placement; (b) participate the Loan to one or more investors in a rated or unrated public offering or private placement; (c) deposit the Loan Documents with a trust, which trust may sell certificates to investors evidencing an ownership interest in the trust assets in a rated or unrated public offering or private placement; or (d) otherwise sell the Loan or interest therein to investors in a rated or unrated public offering or private placement. (The transactions referred to in clauses (a)-(d) are hereinafter referred to as "Secondary Market Transactions.") Borrower shall, at Lender's expense, cooperate in good faith with Lender in effecting any such Secondary Market Transaction and shall cooperate in good faith to implement all requirements reasonably imposed by the participants involved in any Secondary Market Transaction (including, without limitation, a rating agency and/or an institutional purchaser, participant, or investor) including, without limitation, all structural or other changes to the Loan Documents, modifications to any documents to the Loan Documents, delivery of opinions of counsel acceptable to the rating agency or such other purchasers, participants or investors, and addressing such matters as the rating agency or such other purchasers, participants, or investors may require; provided, however, that the Borrower shall not be required to modify any documents evidencing or securing the Loan Documents that would modify (i) the interest rate payable under the Note, (ii) the stated Maturity Date, (iii) the amortization of principal of the Note, or (iv) any other material terms or covenants of the Note. Borrower shall provide such information and documents relating to Borrower, the Collateral, any Leases (as defined in the Security Instrument), and any lessees as Lender or the rating agency or such other purchasers, participants, or investors may reasonably request in connection with a Secondary Market Transaction. Lender shall have the right to provide to the rating agency or prospective purchasers, participants, or investors any information in its possession including, without limitation, financial statements relating to Borrower, the Collateral, and any lessee. Borrower acknowledges and agrees that certain information regarding the Loan and the parties thereto and the Real Property Collateral may be included in a private placement memorandum, prospectus, or other disclosure documents and consents to the release of such information to third parties.

**8.19.** **Obligations of Borrower Joint and Several.** If more than one Person is named as Borrower, each obligation of Borrower under this Agreement shall be the joint and several obligations of each such Person.

**8.20.** **No Modifications or Amendments; No Waiver.** Except as specified herein, the Loan Documents may not be amended, modified or changed, nor shall any waiver of the provisions hereof be effective, except only by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought. Additionally, a waiver of any provision in one event shall not be construed as a waiver of any other provision at any time, as a continuing waiver, or as a waiver of such provision on a subsequent event.

**8.21.** **Integration.** This Agreement and all schedules and exhibits hereto referred to herein, together with the Note and the other Loan Documents, embody the final, entire agreement among the parties and supersede any and all prior commitments, agreements, representations and understandings, whether written or oral, relating to the subject matter hereof and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties. There are no oral agreements among the parties. Except as otherwise provided in this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any Loan Document, the provision contained in this Agreement shall govern and control.

**8.22.** **REMIC Savings Clause.** Notwithstanding anything to the contrary in this Agreement, if the Loan is held by a "real estate investment conduit" (a "REMIC") within the meaning of Section 860D of the Internal Revenue Code of 1986, as amended (the "IRS Code"), and following the release of any Real Property Collateral the ratio of the outstanding principal balance of the Loan to the value of the Real Property Collateral securing the Loan is greater than 125% (based solely on the value of the real property and excluding personal property or going concern value, if any, as determined by Lender in its sole discretion, using any commercially reasonable method permitted to a REMIC under the IRS Code) (such amount, the "REMIC LTV"), then Borrower shall pay down the principal balance of the

---

21

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00196

Loan by an amount equal to the greater of (A) the amount of principal required to be paid pursuant to this Section and (B) the least of the following amounts: (1) if the released Real Property Collateral is sold in an arm's length transaction with an unrelated third party, the net proceeds of such sale; (2) the fair market value of the released Real Property Collateral at the time of the release, as determined by Lender in its sole discretion using any commercially reasonable method permitted to a REMIC under the IRS Code; and (3) an amount such that the REMIC LTV does not increase due to the release.

IN WITNESS WHEREOF, Borrower has executed this Agreement as of the date first written above by and through their duly authorized representatives.

**BORROWER:**

DANIEL P. HIGGINS

Daniel P. Higgins, an individual

© Lightning Docs™; All Rights Reserved.
Loan and Security Agreement    Loan No. 20047

v188

Borrower's Initials: _____

Val-Chris00197

## SIGNATURE AFFIDAVIT AND AKA STATEMENT

I, Daniel P. Higgins, certify that this is my true and correct signature:

Daniel P Higgins

(Print Name)                                      Signature

### AKA STATEMENT

I, Daniel P. Higgins further certify that I am also known as:

Danny Higgins

(Insert Name Variation)                           Sample Signature

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Texas                          )

County of Galveston                     )

On October 29, 2024 ____ before me, Shabrena Lynch-Horton ____, Notary Public
*Date*                                  *Here Insert Name of the Officer*

Personally Appeared Daniel P. Higgins
                                        *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SHABRENA LYNCH HORTON
Notary ID #126193821
My Commission Expires
May 27, 2025

I certify under PENALTY OF PERJURY under the laws of the State of Texas ____ that ____ the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
*Signature of Notary Public*

© Lightning Docs™; All Rights Reserved.
Signature Affidavit and AKA Statement        Loan No. 20047

v188

Val-Chris00198

**LANGUAGE CAPACITY DECLARATION**

**IF NO TRANSLATOR IS NECESSARY, THE SIGNER MUST HANDWRITE THE FOLLOWING IN THE SPACE PROVIDED.**

*"I speak the English language fluently and read with full understanding. I do not require a translator to understand these loan documents."*

I speak the English language fluently and read with full understanding. I do not require a translator to understand these loan documents

**SIGNER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

---

© Lightning Docs™; All Rights Reserved.
Language Capacity Declaration          Loan No. 20047

1

v188

Val-Chris00199

## STATUTE OF FRAUDS NOTICE

THIS STATUTE OF FRAUDS NOTICE is acknowledged and agreed to as of October 29, 2024, by and among Daniel P. Higgins ("Borrower"), and and Val-Chris Investments Inc, a California corporation (CFL License No. 6035063).

As of the date set forth above, Lender, Borrower, and Guarantor have executed and entered into several instruments, agreements and documents relating to a $330,000.00 commercial loan from Lender to Borrower which is guaranteed by Guarantor. In connection therewith, and pursuant to §26.02 of the Texas Business and Commerce Code, Lender, Borrower and Guarantor hereby agree as follows:

**THE WRITTEN DOCUMENTS, AGREEMENTS AND INSTRUMENTS REFERRED TO ABOVE REPRESENT THE FINAL AGREEMENTS BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

IN WITNESS WHEREOF, the parties have carefully read, fully understand and agree to the above.

**BORROWER:**

**DANIEL P. HIGGINS**

_____

Daniel P. Higgins, an individual

**LENDER:**

**VAL-CHRIS INVESTMENTS INC**

By: _____
Name: _____
Title: _____

© Lightning Docs™; All Rights Reserved.
Statute of Frauds Notice     Loan No. 20047

v188

Val-Chris00200

## COMPLIANCE AGREEMENT

| Lender: | Borrower: |
|---|---|
| Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) | Daniel P. Higgins |
| Date: October 29, 2024 | Property Address: 3001 Kleinmann Avenue, Galveston, Texas 77551 |

If requested by Lender or an agent for Lender, the undersigned Borrower agrees to fully cooperate and adjust for clerical, typographical, or scriveners errors, including those concerning material terms, that may be present in any or all of the loan documents if deemed necessary or desirable in the reasonable discretion of Lender.

The undersigned Borrower agrees to comply with all above noted requests by Lender or Agent for Lender within 30 days from the date of mailing said requests. Borrower agrees to assume all costs including, by way of illustration and not limitation, actual expenses and legal fees for failing to comply with correction requests in such 30-day time period.

The undersigned Borrower does hereby so agree and covenant in order to assure that the Loan Documents executed this date will conform and be acceptable in the market place in the instance of transfer, sale or conveyance by Lender or its interest in and to said loan documentation.

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

1

© Lightning Docs™; All Rights Reserved.
Compliance Agreement      Loan No. 20047

v188

Val-Chris00201

Val-Chris00202

# HAZARD INSURANCE DISCLOSURE

| Lender:<br>Val-Chris Investments Inc, a California corporation<br>(CFL License No. 6035063) | Borrower:<br>Daniel P. Higgins |
|---|---|
| Date:<br>October 29, 2024 | Property Address:<br>3001 Kleinmann Avenue, Galveston, Texas 77551 |

Borrower shall maintain insurance coverage on any collateral being secured under the Loan during the entire life of the Loan. This insurance coverage, inclusive of any applicable earthquake coverage, must meet minimum requirements set by Lender.

NOTICE: AN INSURANCE POLICY AFFORDING THE MINIMALLY ACCEPTABLE COVERAGE MUST BE KEPT IN FORCE FOR THE TERM OF THE LOAN. SHOULD YOU FAIL EITHER TO MAINTAIN COVERAGE OR TO PAY ANY PREMIUM WHEN DUE AND THE POLICY IS CANCELLED, THE LOAN WILL BE IN DEFAULT UNDER ANY TERMS OF THE LOAN AGREEMENT AND ANY SECURITY INSTRUMENT. AS SUCH, THE LENDER MAY, UPON LEARNING OF THE DEFAULT, OBTAIN INSURANCE AT YOUR EXPENSE TO PROTECT ITS INTEREST IN THE LOAN SECURITY.

Lender shall not, as a condition of receiving, renewing or extending a loan secured by real property:

(a)     Require Borrower to provide hazard insurance coverage against risks to the improvements on that real property in an amount exceeding the replacement value of the improvements on the real property.

(b)     Require Borrower to acquire, purchase or negotiate any insurance policy covering the real property through a particular insurance company or insurance agent.

(c)     Unreasonably reject an insurance policy furnished by Borrower for the protection of the real property. However, Lender may disapprove the insurance company selected by Borrower for sensible and sufficient reasons, including but not limited to extent of coverage required and the financial soundness and the services of an insurer.

(d)     Require Borrower to purchase any insurance product from the Lender or its affiliate as a condition of the Loan.

Borrower's choice of insurer or agent will not affect Lender's credit decision or terms.

## TEXAS COLLATERAL PROTECTION ACT NOTICE
### 307.052 (a)

**Property Insurance Disclosure - Texas Finance Code Section 307.052 Collateral Protection Insurance Notice**. (a) Borrower is required to (i) keep the property insured against damage in the amount specified herein; (ii) purchase the insurance from an insurer that is authorized to do business in the State of Texas or an eligible surplus lines insurer or otherwise as provided herein; and (iii) name Lender as the person to be paid under the policy in the event of a loss as provided herein; (b) subject to the provisions hereof, Borrower must, if required by Lender, deliver to Lender a copy of the policy and proof of the payment of insurance premiums; and (c) subject to the provisions hereof, if borrower fails to meet any requirement listed in the

© Lightning Docs™; All Rights Reserved.
Hazard Insurance Disclosure        Loan No. 20047

v188

Val-Chris00203

foregoing subparts (a) or (b), lender may obtain collateral protection insurance on behalf of Borrower at borrower's expense.

THIS DISCLOSURE IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND.

The undersigned borrower has received, read and approved this Hazard Insurance Disclosure as of the date set forth above.

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

---

2

Val-Chris00204

# ARBITRATION AND WAIVER OF RIGHT TO JURY TRIAL AGREEMENT

THIS ARBITRATION AND WAIVER OF RIGHT TO JURY TRIAL AGREEMENT ("Agreement") is entered into as of October 29, 2024, and is by and among Daniel P. Higgins ("Borrower"); and Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) ("Lender"). Borrower and Lender are collectively referred to herein as "Parties" and individually as a "Party."

## RECITALS

A.    Borrower has obtained or will obtain a mortgage loan from Lender as evidenced by that certain Loan and Security Agreement of even date, executed by Borrower ("Loan Agreement") and that certain Secured Note of even date, executed by Borrower ("Note"), which are secured by the Collateral identified in the Loan Agreement. The Loan Agreement, Note, any Security Instrument, and Security Agreements are collectively referred to herein as the "Loan Documents" which evidence the "Loan."

B.    All Parties wish to arbitrate any and all disputes among them that may arise out of the Loan.

## AGREEMENT

NOW, THEREFORE, in consideration of these Recitals and of the Lender agreeing to make the Loan to Borrower, and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties agree as follows:

1.    **Mutual Agreement To Arbitrate Disputes.** The Parties agree that any Claim, as defined below, involving the Loan, including, but not limited to claims arising from the origination, documentation, disclosure, servicing, collection or any other aspect of the Loan transaction or the coverage or enforceability of this Agreement, shall be resolved exclusively by binding arbitration under the terms of this Agreement. This Agreement shall also be binding on the agents, successors and assigns of the parties and the Loan.

2.    Claim Defined.

2.1    "Claim" shall include, but not be limited to:

2.1.1.    Any claimed wrongdoing, such as misrepresentation, negligence, breach of contract, breach of fiduciary duty, unconscionability, fraud in the inducement, rescission, breach of the covenant of good faith and fair dealing and unfair business practices.

2.1.2.    Any claimed violation of state or federal laws, including, but not limited to consumer credit, truth-in-lending, civil rights, equal opportunity, real estate settlement, housing discrimination laws, fair lending acts, licensing, loan regulation and unfair business practices.

2.2.    "Claim" shall not include:

2.2.1.    Actions by the Lender to judicially or non-judicially foreclose on the Note and Security Instrument or any Security Agreements for the Loan, to enjoin waste, to collect rents, interpleader actions or actions for a receiver, to recover possession, ejectment or relief from the automatic stay in bankruptcy, or to obtain relief through Governmental Authorities.

2.2.2.    Actions for provisional remedies such as a temporary restraining order or preliminary injunction or for a permanent injunction based upon an arbitration award.

3.    **ARBITRATION OF DISPUTES.** TO THE EXTENT A PRE-DISPUTE WAIVER OF THE RIGHT TO TRIAL BY JURY IS NOT ENFORCEABLE UNDER APPLICABLE LAW, ANY AND ALL DISPUTES, CONTROVERSIES OR CLAIMS ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING, WITHOUT LIMITATION, THE MAKING, PERFORMANCE, OR INTERPRETATION OF THE LOAN DOCUMENTS, SHALL BE RESOLVED BY BINDING ARBITRATION. UNLESS OTHERWISE AGREED ON, THE ARBITRATION SHALL BE CONDUCTED IN ACCORDANCE WITH THE THEN-CURRENT ARBITRATION PROCEDURES SET FORTH UNDER CALIFORNIA LAW. JUDGMENT ON THE ARBITRATION AWARD MAY BE ENTERED IN ANY COURT HAVING

1

Val-Chris00205

JURISDICTION. UNLESS OTHERWISE AGREED BY THE PARTIES, THE ARBITRATION SHALL BE HELD BEFORE A SINGLE ARBITRATOR SELECTED AS FOLLOWS: THE DISPUTING PARTIES SHALL, WITHIN TEN (10) BUSINESS DAYS FROM THE DATE ARBITRATION IS REQUESTED BY EITHER PARTY, AGREE UPON AN ARBITRATOR. IF THE PARTIES CANNOT SO AGREE, THEN EACH PARTY, WITHIN FIVE (5) BUSINESS DAYS THEREAFTER, SHALL NAME AN ARBITRATOR WHO SHALL BE AN ATTORNEY LICENSED TO PRACTICE IN CALIFORNIA AND EXPERIENCED AND QUALIFIED IN REAL ESTATE MATTERS OF THE TYPE CONTEMPLATED BY THE LOAN DOCUMENTS OR A RETIRED CALIFORNIA SUPERIOR OR APPELLATE COURT JUDGE. THOSE TWO NAMED ARBITRATORS SHALL THEN, WITHIN FIVE (5) BUSINESS DAYS, SELECT A THIRD ARBITRATOR WHO SHALL BE QUALIFIED AS DEFINED ABOVE, AND SUCH THIRD ARBITRATOR SHALL BE THE SOLE ARBITRATOR TO HEAR AND DETERMINE THE DISPUTE. IF ANY PARTY HERETO FAILS TO NAME AN ARBITRATOR WITHIN THE TIME LIMIT PROVIDED IN THIS SECTION, THEN THE ARBITRATOR TIMELY NAMED BY THE OTHER PARTY SHALL HEAR AND DECIDE THE DISPUTE. IF THE ARBITRATION IS COMMENCED, THE PARTIES AGREE TO PERMIT DISCOVERY PROCEEDINGS OF THE TYPE PROVIDED UNDER CALIFORNIA LAW BOTH IN ADVANCE OF, AND DURING RECESSES OF, THE ARBITRATION HEARINGS. ALL FACTS AND OTHER INFORMATION RELATING TO ANY ARBITRATION ARISING UNDER THIS DECLARATION SHALL BE KEPT CONFIDENTIAL TO THE FULLEST EXTENT PERMITTED BY LAW. THE DECISION OF THE ARBITRATOR(S) SHALL FOLLOW THE LAW, SHALL BE RENDERED WITHIN TEN (10) BUSINESS DAYS FOLLOWING THE CONCLUSION OF THE ARBITRATION, AND SHALL BE SET FORTH IN A WRITTEN OPINION STATING THE FINDINGS OF FACT OF THE ARBITRATOR(S) AND LEGAL AUTHORITIES THAT ARE THE BASIS OF THE DECISION. THE VENUE FOR ANY SUCH ARBITRATION SHALL BE ORANGE COUNTY, CALIFORNIA. THE COSTS OF THE ARBITRATOR SHALL BE SPLIT EQUALLY BY THE PARTIES BUT SHALL BE A RECOVERABLE COST FOR THE PARTY PREVAILING IN THE ARBITRATION.

4. **ARBITRATION RELATED WAIVER.** THE PARTIES hereby freely waive the right to trial by judge or jury, the right to appeal, pretrial discovery and application of the rules of evidence.

5. **WAIVER OF JURY TRIAL.** TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER, ANY GUARANTOR, ANY PLEDGOR, AND LENDER AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THE LOAN DOCUMENTS. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. BORROWER AND, BY ITS ACCEPTANCE OF THE BENEFITS OF THE LOAN, LENDER EACH (A) ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT FOR BORROWER AND LENDER TO ENTER INTO A BUSINESS RELATIONSHIP, THAT BORROWER AND LENDER HAVE ALREADY RELIED ON THIS WAIVER BY ENTERING INTO THE LOAN OR ACCEPTING ITS BENEFITS, AS THE CASE MAY BE, AND THAT EACH SHALL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS, AND (B) FURTHER WARRANTS AND REPRESENTS THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THE LOAN DOCUMENTS.

2

Val-Chris00206

6. **Attorney Fees.** Borrower and any Guarantor, Pledgor, and Debtor, if any, agree to pay the following costs, expenses, and Attorneys' Fees paid or incurred by Lender, or adjudged by a court: (a) reasonable costs of collection and costs, expenses, and Attorneys' Fees paid or incurred in connection with the collection or enforcement of the Loan Documents, whether or not suit is filed; (b) reasonable costs, expenses, and Attorneys' Fees paid or incurred in connection with representing Lender in any bankruptcy, reorganization, receivership, or other proceedings affecting creditors' rights and involving a claim under the Loan Documents; (c) reasonable costs, expenses, and Attorneys' Fees incurred to protect the lien of the Security Instrument; and (d) costs of suit and such sum as the court may adjudge as Attorneys' Fees in any action to enforce payment of the Loan Documents or any part of it.

In addition to the aforementioned fees, costs, and expenses, Lender in any lawsuit or other dispute shall be entitled to its Attorneys' Fees, and all other fees, costs, and expenses incurred in any post-judgment proceedings to collect or enforce any judgment. This provision for the recovery of post-judgment fees, costs, and expenses is separate and several and shall survive the merger of the Loan Documents into any judgment on the Loan Agreement, Note, Security Instrument, or any other Loan Documents.

7. **Capitalized Terms.** Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Loan Documents, each executed of even date herewith.

8. **Loan Agreement.** This Agreement is subject to the provisions of the Loan Agreement, which is incorporated herein.

IN WITNESS WHEREOF, the parties have carefully read, fully understand and agree to the above.

**BORROWER:**

**DANIEL P. HIGGINS**

_____
Daniel P. Higgins, an individual

**LENDER:**

**VAL-CHRIS INVESTMENTS INC, A CALIFORNIA CORPORATION**

By: _____
Name: _____
Title: _____

---

3

Val-Chris00207

# BALLOON PAYMENT DISCLOSURE

| Lender: Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) | Borrower: Daniel P. Higgins |
|---|---|
| Date: October 29, 2024 | Property Address: 3001 Kleinmann Avenue, Galveston, Texas 77551 |

THE NOTE YOU ARE SIGNING WITH RESPECT TO THE LOAN YOU ARE OBTAINING REQUIRES THE ENTIRE AMOUNT OF OUTSTANDING PRINCIPAL AND ACCRUED INTEREST TO BE PAYABLE IN FULL ON THE "BALLOON PAYMENT DATE" INDICATED BELOW.

## NOTICE TO BORROWER:
**IF YOU DO NOT HAVE THE FUNDS TO PAY THE BALLOON PAYMENT WHEN IT COMES DUE, YOU MAY HAVE TO OBTAIN A NEW LOAN AGAINST YOUR PROPERTY TO MAKE THE BALLOON PAYMENT. IN THAT CASE, YOU MAY AGAIN HAVE TO PAY COMMISSIONS, FEES, AND EXPENSES FOR THE ARRANGING OF THE NEW LOAN. IN ADDITION, IF YOU ARE UNABLE TO MAKE THE MONTHLY PAYMENTS OR THE BALLOON PAYMENT, YOU MAY LOSE THE PROPERTY AND ALL OF YOUR EQUITY THROUGH FORECLOSURE. KEEP THIS IN MIND IN DECIDING UPON THE AMOUNT AND TERMS OF THIS LOAN.**

PLEASE BE SURE YOU FULLY UNDERSTAND THE ABOVE BEFORE SIGNING THE NOTE AND OTHER RELATED LOAN DOCUMENTS.

**BALLOON PAYMENT DATE:**        **November 1, 2025**

**BALLOON PAYMENT AMOUNT:**        **$330,000.00\***

(\*Plus any unpaid interest, charges, fees, costs and other unpaid amounts due under the Loan Documents.)

I ACKNOWLEDGE RECEIPT OF THE ABOVE AND CERTIFY MY FULL UNDERSTANDING OF ALL OF THE TERMS AND CONDITIONS OF THE LOAN AGREEMENT AND NOTE, INCLUDING THE BALLOON PAYMENT REQUIREMENT AS OF THE DATE SET FORTH ABOVE.

**BORROWER:**

DANIEL P. HIGGINS

Daniel P. Higgins, an individual

1

Val-Chris00208

## CONDITIONAL LOAN APPROVAL

| | |
|---|---|
| Lender:<br>Val-Chris Investments Inc, a California corporation<br>(CFL License No. 6035063) | Borrower:<br>Daniel P. Higgins |
| Date:<br>October 29, 2024 | Property Address:<br>3001 Kleinmann Avenue, Galveston, Texas 77551 |

Lender has conditionally approved Borrower for a loan in a certain amount as evidenced by the Loan Agreement and other documents executed in connection therewith, collectively, the "Loan Documents" which evidence the "Loan." This conditional loan approval is subject to the following:

1.  No Loan Approval Until Loan Disbursed. Lender has not and will not fully approve the Loan until Lender has deposited funds into an escrow account and has instructed the escrow company to disburse the funds to Borrower directly and/or to third parties on Borrower's behalf. No oral modification of this condition is valid or effective.

2.  Other Conditions. Lender will not fully approve the Loan until other conditions and requirements by Lender not specified in this document have been satisfied to Lender's satisfaction, in its sole discretion.

By signing below, I understand and agree to the foregoing and execute this document on the date set forth above.

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

© Lightning Docs™; All Rights Reserved.
Conditional Loan Approval      Loan No. 20047

v188

Val-Chris00209

## E.C.O.A. APPRAISAL REPORT DISCLOSURE

### (Pursuant to E.C.O.A.)

| Lender: | Borrower: |
|---|---|
| Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) | Daniel P. Higgins |
| Date: | Property Address: |
| October 29, 2024 | 3001 Kleinmann Avenue, Galveston, Texas 77551 |

We may order an appraisal to determine the property's value and charge you for this appraisal. We will promptly give you a copy of any appraisal, even if your loan does not close.

You can pay for an additional appraisal for your own use at your own cost.

### NOTICE RE UNBIASED APPRAISALS

Pursuant to California Civil Code § 1102.6g:

Any appraisal of the property is required to be unbiased, objective, and not influenced by improper or illegal considerations, including, but not limited to, any of the following: race, color, religion (including religious dress, grooming practices, or both), gender (including, but not limited to, pregnancy, childbirth, breastfeeding, and related conditions, and gender identity and gender expression), sexual orientation, marital status, medical condition, military or veteran status, national origin (including language use and possession of a driver's license issued to persons unable to provide their presence in the United States is authorized under federal law), source of income, ancestry, disability (mental and physical, including, but not limited to, HIV/AIDS status, cancer diagnosis, and genetic characteristics), genetic information, or age. If a buyer or seller believes that the appraisal has been influenced by any of the above factors, the seller or buyer can report this information to the lender or mortgage broker that retained the appraiser and may also file a complaint with the Bureau of Real Estate Appraisers at https://www2.brea.ca.gov/complaint/ or call (916) 552-9000 for further information on how to file a complaint.

By signing below, Borrower acknowledges that Borrower has read and received a copy of this document as of the date set forth above.

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

© Lightning Docs™; All Rights Reserved.
Notice of Right to Receive Appraisal Disclosure     Loan No. 20047

v188

Val-Chris00210

## DESIGNATION OF HOMESTEAD AND AFFIDAVIT OF NON-HOMESTEAD

| Lender:<br>Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) | Borrower:<br>Daniel P. Higgins |
|---|---|
| Date:<br>October 29, 2024 | Property Address:<br>3001 Kleinmann Avenue, Galveston, Texas 77551 |

Borrower certifies to Lender, its agents, employees, successors and assigns the following:

1.      I have applied to Lender for a loan in the principal amount of $330,000.00 secured by the Property.

2.      Lender has stressed to me the importance of knowing whether I occupy or intend to occupy the Property and whether the Property is my homestead.

3.      I certify and represent to Lender that:

A.      Daniel P. Higgins's true and only principal residence is located at: 2130 Winding Springs Drvie League City TX 77573

B.      The Property that will secure this loan is not the homestead of any party to the Loan including any affiliates or relatives of Borrower ("Borrower-Affiliated Party");

C.      Borrower has no intention of ever making the Property securing the Loan the homestead of the Borrower or any Borrower-Affiliated Party;

D.      Neither Borrower nor any Borrower-Affiliated Party has any intention of ever making the Property securing the Loan his or her principal or secondary residence, or otherwise occupying the Property at any time.

E.      Borrower disclaims all homestead rights, interest, and exemption in the Property; and

F.      Borrower acknowledges that the Property is therefore not exempt from a forced sale.

4.      Borrower agrees to hold Lender harmless and agree to defend, indemnify, protect and hold Lender and its agents, officers, contractors, and employees harmless from and against any and all claims asserted or liability established that arises from the falsity of any part of this declaration.

Borrower declares under penalty of perjury under the laws of the state in which the Property is located that the foregoing is true and correct as of the date set forth above.

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

© Lightning Docs™; All Rights Reserved.
Designation of Homestead and Affidavit of Non-Homestead          Loan No. 20047          v188

Val-Chris00211

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of Texas )

County of Galveston )

On October 29th 2024 before me, Shabrena Lynch-Horton , Notary Public
    *Date*                                    *Here Insert Name of the Officer*

Personally Appeared Daniel P. Higgins
                                            *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

SHABRENA LYNCH HORTON
Notary ID #126193821
My Commission Expires
May 27, 2025

I certify under PENALTY OF PERJURY under the laws of the State of Texas that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    *Signature of Notary Public*

---

© Lightning Docs™; All Rights Reserved.
Designation of Homestead and Affidavit of Non-Homestead     Loan No. 20047

2

v188

Val-Chris00212

## BUSINESS PURPOSE OF LOAN CERTIFICATION

| Lender: Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) | Borrower: Daniel P. Higgins |
|---|---|
| Date: October 29, 2024 | Property Address: 3001 Kleinmann Avenue, Galveston, Texas 77551 |

Borrower certifies to Lender and its successors and assigns the following as true and correct:

1.      Borrower has applied for and has obtained or may obtain a loan in the principal amount of $330,000.00 (the "Note") pursuant to the terms of the Loan and Security Agreement of even date herewith (the "Loan Agreement"). The Loan Agreement, and all other documents executed in connection therewith shall be referred to herein as the "Loan Documents" which evidence the "Loan."

2.      Lender has stressed to Borrower the importance of knowing the primary purpose of this Loan. Borrower knows that the legal responsibilities of the Lender vary considerably depending upon whether a loan is a consumer loan, which is for personal, household or family purposes, or a business loan, which is for every other purpose.

3.      Borrower has previously represented to Lender and again represents to Lender in this certification, its successors and assigns, that ALL of the purposes of the Loan, exclusive of commissions and loan expenses incurred to obtain the Loan are:

Purpose                                                             Approximate Amount

| | |
|---|---|
| Business Growth | 19,000 |
| | |
| | |
| | |

---

1

Val-Chris00213

4. NO part of the proceeds of the Loan are intended to be used for a consumer purpose except the following. If there are no consumer purposes for the loan proceeds, please indicate "N/A" or "NONE" below:

| Purpose | Approximate Amount |
|---|---|
| N/A | |
| | |

Borrower declares under penalty of perjury under the laws of the state in which the Property is located that the foregoing is true and correct as of the date set forth above.

**BORROWER:**

DANIEL P. HIGGINS

Daniel P. Higgins, an individual

© Lightning Docs™; All Rights Reserved.
Business Purpose of Loan Certification      Loan No. 20047

v188

Val-Chris00214

# ENVIRONMENTAL INDEMNITY AGREEMENT

THIS ENVIRONMENTAL INDEMNITY AGREEMENT ("Indemnity") is entered into as of October 29, 2024, by and among Daniel P. Higgins ("Borrower") (Borrower is referred to herein as "Indemnitor"); to and for the benefit of Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) ("Lender"), and its successors, assigns, services, and participants, any party who now or hereafter holds an interest in the Loan described below, and the respective parent, subsidiary, and affiliated corporations of each of the foregoing, and the respective directors, officers, agents, attorneys, and employees of each of the foregoing (each of which shall be referred to in this Indemnity individually as an "Indemnitee" and collectively as the "Indemnitees").

In consideration of Lender agreeing to make the Loan to Borrower, and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Indemnitor represents, warrants, and agrees as follows:

**1.     Definitions.**     The following terms as used in this Indemnity shall have the meaning set forth in this Section.

**1.1**     "**Applicable Law**" means any and all laws, statutes, codes, ordinances, regulations, enactments, decrees, judgments, and orders of any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit holding jurisdiction over the Property (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

**1.2**     "**Environmental Laws**" means any and all present or future laws (whether common law, statute, rule, regulation, or otherwise), permits, and other requirements of any federal or state governmental unit, or of any regional or local governmental unit with jurisdiction over the Property, for the protection of health, industrial hygiene, or the environment, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) as amended (42 United States Code ("U.S.C.") §§ 9601-9675); the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. §§ 6901-6992k); the Hazardous Materials Transportation Act (49 U.S.C. §§ 5101-5127); the Federal Water Pollution Control Act (33 U.S.C. §§ 1251-1376); the Clean Air Act (42 U.S.C. §§ 7401-7671q); the Toxic Substances Control Act (15 U.S.C. §§ 2601-2692); the Refuse Act (33 U.S.C. §§ 407-426p); the Emergency Planning and Community Right-To-Know Act (42 U.S.C. §§ 11001-11050); the Safe Drinking Water Act (42 U.S.C. §§ 300f-300j), and all present or future environmental quality or protection laws, statutes or codes or other requirements of any federal or state governmental unit, or of any regional or local governmental unit with jurisdiction over the Property.

**1.3**     "**Governmental Authority**" means any and all courts, boards, agencies, commissions, offices, or authorities of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city, or otherwise) whether now or later in existence.

**1.4**     "**Hazardous Materials**"     means any and all (a) substances defined as "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in CERCLA, RCRA, and the Hazardous Materials Transportation Act (49 United States Code §§5101-5127), and in the regulations promulgated under those laws; (b) substances defined as "hazardous wastes" under Environmental Laws and in the regulations promulgated under that law in the State where the Real Property Collateral is located and in the regulations promulgated under that law; (c) substances defined as "hazardous substances" under Environmental Laws in the State where the Real Property Collateral is located; (d) substances listed in the United States Department of Transportation Table (49 Code of Federal Regulations § 172.101 and amendments); (e) substances defined as "medical wastes" under Environmental Laws in the State where the Real Property Collateral is located; (f) asbestos-containing materials; (g) polychlorinated biphenyl; (h) underground storage tanks, whether empty, filled, or partially filled with any substance; (i) petroleum and petroleum products, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel, or any such mixture; and (j) such other substances, materials, and wastes that are or become regulated under applicable local, state, or federal law, or that are classified as hazardous or toxic under any Governmental Requirements or that, even if not so regulated, are known

Val-Chris00215

to pose a hazard to the health and safety of the occupants of the Real Property Collateral or of real property adjacent to it.

1.5 **"Hazardous Material Activity"** means any actual storage, holding, use, release (including, without limitation, a release as defined under Applicable Law), emission, discharge, generation, processing, abatement, removal, repair, remediation, closure, site restoration, cleanup or detoxification, disposal, handling, or transportation of any Hazardous Material from, under, in, at, on, or about the Property or the surrounding property, or any other remedial act, activity, or occurrence that causes or would cause such event to exist.

1.6 **"Loan"** means the loan provided by Lender to Borrower as provided for in the Loan Documents.

1.7 **"Loan Documents"** means that certain Loan and Security Agreement ("Loan Agreement"), Secured Note ("Note"), any Security Instruments or Security Agreements (as defined in the Loan Agreement) and all attendant loan documents executed in connection therewith.

1.8 **"Losses"** means any and all losses, liabilities, damages, demands, claims, actions, judgments, causes of action, assessments, penalties, costs, and expenses (including, without limitation, the reasonable fees and disbursements of outside legal counsel, accountants, consultants, and experts and the reasonable charges of in-house legal counsel and accountants), and all foreseeable and unforeseeable consequential damages (including, without limitation, costs of any and all investigation, cleanup, removal, remediation, closure, site restoration of any Hazardous Material, or any other remedial acts that are required to be performed on the Property by any Environmental Laws and all legal fees therefor).

1.9 **"Property"** means the Real Property Collateral identified in the Loan Agreement and further described in the attached Exhibit "A" attached hereto and incorporated herein as fully set forth.

2. **Representations and Warranties.** Except as otherwise disclosed to Lender in writing prior to the execution of this Agreement, Indemnitor represents and warrants the following:

2.1 **Environmental Law Compliance.** Indemnitor and the Property are in compliance with all applicable Environmental Laws relating to the Property and the use of the Property;

2.2 **No Hazardous Materials Affecting Property.** There are no Hazardous Materials in, on, under, or affecting the Property, except those in compliance with all applicable Environmental Laws, and disclosed to Lender in writing, and there is no asbestos or asbestos-containing construction materials in, on, under, or affecting the Property;

2.3 **No Usage of Hazardous Materials in Property.** Indemnitor has not engaged in any Hazardous Material Activity at, in, on, under, about, or from the Property except in compliance with all applicable Environmental Laws and as disclosed in writing to Lender;

2.4 **No Knowledge of Hazardous Materials.** Neither Indemnitor nor any agent, affiliate, tenant, or partner of Indemnitor has received any notice or advice from any Governmental Authority or any source (including third parties) whatsoever with respect to Hazardous Materials in, on, at, under, about, from, or affecting the Property; nor have any of them received a written notice from any other third party alleging the occurrence of any Hazardous Material Activity in violation of any applicable Environmental Laws or demanding payment or contribution for environmental damage or injury to the Property; and Indemnitor has no knowledge of any prior owner or occupant of the Property receiving any such notice or advice;

2.5 **No Border Zone Property or Hazardous Waste Property.** No portion of the Property contains or is located within Two Thousand (2,000) feet of a significant disposal of hazardous waste under Applicable Law that could cause the Property to be classified as a hazardous waste property or a border zone property; and

2.6 **No Underground Storage/Hazardous Materials.** No underground storage tanks or underground Hazardous Materials deposits are located on or under the Property.

2.7 **No Investigation.** The Property and Indemnitor are not in violation of any Environmental Laws or subject to any existing, pending, or threatened investigation by any Governmental Authority under any Environmental Laws.

Val-Chris00216

**2.8    Required Permits.** Indemnitor has not obtained and is not required by any Environmental Laws to obtain any permits or licenses to construct or use the Property or the Improvements (as defined in the Security Instrument).

**2.9    No Prior Release.** Indemnitor has conducted an appropriate inquiry into previous uses and ownership of the Property, and after such inquiry determined that no Hazardous Materials have been disposed of, transported, or released on or at the Property.

**2.10    Adjacent Property.** To the best of Indemnitor's knowledge and belief, after diligent investigation and inquiry, no real property adjoining the Property is being used, or has ever been used at any previous time, for any Hazardous Material Activity, nor is any other real property adjoining the Property affected by Hazardous Materials contamination.

**2.11    Not Subject to any Order.** No investigation, administrative order, consent order or agreement, litigation, or settlement with respect to Hazardous Materials or Hazardous Materials contamination is proposed, threatened, anticipated, or in existence regarding the Property. The Property is not currently on, and to Indemnitor's knowledge, after diligent investigation and inquiry, has never been on, any federal or state "Superfund" or "Superlien" list.

**2.12    No Notice of Violation.** Indemnitor nor, to the best of Indemnitor's knowledge and belief, after diligent investigation and inquiry, any tenant of any portion of the Property has received any notice from any Governmental Authority regarding any violation of any Environmental Laws.

**2.13    Compliant Use.** The use that Indemnitor makes and intends to make of the Property shall not result in the disposal or release of any Hazardous Materials on, in, or to the Property.

**3.    Covenants of Indemnitor.** Indemnitor covenants as follows:

**3.1    Asbestos Free Property.** Except as otherwise disclosed to Lender in writing prior to the execution of this Agreement, the Property is and shall be kept free of asbestos and asbestos-containing construction materials.

**3.2    No Hazardous Materials on Property.** Except as otherwise disclosed to Lender in writing prior to the execution of this Agreement, neither Indemnitor nor any occupant of the Property shall use, transport, store, treat, generate, handle, dispose of, or in any manner deal with Hazardous Materials on, in, at, about, or from the Property, except in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations, including Environmental Laws, and as disclosed in writing to Lender; nor shall Indemnitor or any occupant cause the Property to become subject to regulation as a hazardous waste treatment, storage, or disposal facility under any Environmental Law.

**3.3    Compliance with Environmental Laws.** Except as otherwise disclosed to Lender in writing prior to the execution of this Agreement, Indemnitor shall comply with, and ensure compliance by all occupants, business invitees and other authorized or unauthorized persons on the premises, of the Property with, all Environmental Laws and shall keep the Property free and clear of any liens imposed pursuant to any Environmental Laws.

**3.4    Notify Lender of Hazardous Materials on Property.** In the event that Indemnitor receives any notice or advice from any Governmental Authority or any source whatsoever with respect to Hazardous Materials in, on, under, from, or affecting the Property, Indemnitor shall immediately notify Lender, in writing.

**3.5    No Underground Storage Tanks on Property.** Except as otherwise disclosed to Lender in writing prior to the execution of this Agreement, Indemnitor shall not allow to exist on, under, or about the Property any underground storage tanks or underground Hazardous Materials deposits.

**3.6    Discovery of Hazardous Materials on Property.** If at any time Hazardous Materials are discovered in, on, under, or about the Property that do not comply with the provisions herein, Indemnitor shall immediately inform Lender, in writing, of such and Indemnitor's proposed remedial program, and Indemnitor shall remove such Hazardous Materials from the Property or the groundwater underlying the Property or remediate the same in accordance with all requirements of the appropriate governmental entities. All remedial work shall be conducted and completed promptly, at Indemnitor's sole cost and expense, by a contractor or contractors approved by Lender.

Val-Chris00217

**3.7** **Environmental Site Assessment.** Indemnitor, at its sole expense, shall (i) perform any environmental site assessment or other investigation of environmental conditions in connection with the Property (including, without limitation, sampling, testing, and analysis of soil, water, air, building materials and other materials and substances, whether solid, liquid, or gas), pursuant to Lender's written request upon Lender's reasonable belief that the Property is not in full compliance with Environmental Laws or Permits; and (ii) if requested by Lender, share all reports, results, and correspondence related to such assessments or investigations with Lender. Indemnitor agrees to have any written reports structured to allow Lender (and any other party designated by Lender) to rely on such reports.

**3.8** **Lender's Right to Enter Property; Samples of Property; Payment by Indemnitor if violation of Environmental Laws.** Indemnitee has the right, but not the obligation, after reasonable prior notice to Indemnitor to enter upon the Property at all reasonable times to assess the environmental condition of the Property, including, without limitation, to conduct any environmental assessment or audit (the scope of which shall be determined in Indemnitee's sole discretion) and to take samples of soil, groundwater or other water, air quality, and building materials, and to conduct other invasive testing. Such assessment or audit shall be conducted in such a manner to minimize interference with the conduct of business at the Property. Indemnitor agrees to reasonably cooperate in connection therewith. If any such undertaking discloses that a violation of, or a liability under, any Environmental Law exists, or if such undertaking was required or prescribed by any Environmental Law or Governmental Authority, or if the inspection is performed while an Event of Default exists under any of the Loan Documents, then Indemnitor shall pay all reasonable costs and expenses incurred in connection with such undertaking; otherwise, the costs and expenses of such undertaking shall be paid by Indemnitee.

**4.** Indemnification From Indemnitor.

**4.1** **Indemnification.** To the fullest extent permitted by law, Indemnitor agrees to indemnify, defend, protect, and hold harmless the Indemnitees from and against any and all Losses suffered, imposed on, or incurred by such Indemnitee or asserted against such Indemnitee arising out of or as a result of any of the following:

**4.1.1.** Any breach of the representations, warranties, and covenants made by Indemnitor in this Indemnity;

**4.1.2.** Any investigation, inquiry, order, hearing, action, or other proceeding by or before any Governmental Authority in connection with any Hazardous Material Activity;

**4.1.3.** Any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any occurrence or violation described above; or

**4.1.4.** Any claim, demand or cause of action, or any action or other proceeding, whether meritorious or not, brought or asserted against any Indemnitee that directly or indirectly relates to, arises from, or is based on any of the matters described above, or any allegation of any such matters.

**5.** **Condition to Loan.** Borrower acknowledges and agrees that Lender has made it a condition of making the Loan to Borrower that this Indemnity be executed and delivered by the Indemnitor in order to protect the Indemnitees from such liabilities, costs, and expenses as set forth in this Indemnity.

**6.** **Survival of Obligations.** The rights of each Indemnitee under this Indemnity shall be in addition to any other rights and remedies of such Indemnitee against any Indemnitor under any other document or instrument now or hereafter executed by such Indemnitor, or at law or in equity (including, without limitation, any right of reimbursement or contribution pursuant to CERCLA), and shall not in any way be deemed a waiver of any of such rights. Each Indemnitor agrees that it shall have no right of contribution (including, without limitation, any right of contribution under CERCLA) or subrogation against any other Indemnitor under this Indemnity unless and until all obligations of such Indemnitor have been satisfied in full. Each Indemnitor further agrees that, to the extent that the waiver of its rights of subrogation and contribution as set forth in this Indemnity is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation or contribution such Indemnitor may have shall be junior and subordinate to the rights of each Indemnitee against each Indemnitor under this Indemnity.

**7.** **Interest.** All obligations of the Indemnitor under this Indemnity shall be payable on demand, and any amount due and payable under this Indemnity to any Indemnitee by any Indemnitor that is not paid

Val-Chris00218

within thirty (30) days after written demand for it from an Indemnitee with an explanation of the amounts demanded shall bear interest from the date of such demand until paid at the default rate identified in the Secured Note.

8.     **Payment of Costs and Expenses.** The Indemnitor shall pay to each Indemnitee all costs and expenses (including, without limitation, the reasonable fees and disbursements of any Indemnitee's outside legal counsel and the reasonable charges of any Indemnitee's in-house legal counsel) incurred by such Indemnitee in connection with, or the enforcement of, this Indemnity.

9.     **Binding on Successors; Joint and Several Liability.** This Indemnity shall be binding upon each Indemnitor, its heirs, representatives, administrators, executors, successors, and assigns and shall inure to the benefit of and shall be enforceable by each Indemnitee, its successors, endorsees, and assigns (including, without limitation, any entity to which the Lender assigns or sells all or any portion of its interest in the Loan). Any married person executing this Indemnity agrees that recourse may be had against community assets and against such person's separate property for the satisfaction of all obligations. If this Indemnity is executed by more than one person or entity, the liability of each such person and entity shall be the joint and several obligations of each of them.

10.    **Governing Law; Consent to Jurisdiction and Venue.** This Agreement is made by Lender and accepted by Indemnitor in the State of California except that at all times the provisions for the creation, perfection, priority, enforcement and foreclosure of the liens and security interests created in the Property under the Loan Documents shall be governed by and construed according to the laws of the state in which each Property is situated. To the fullest extent permitted by the law of the state in which each Property is situated, the law of the State of California shall govern the validity and enforceability of all Loan Documents, and the debt or obligations arising hereunder (but the foregoing shall not be construed to limit Lender's rights with respect to such security interest created in the state in which each Property is situated). The parties agree that jurisdiction and venue for any dispute, claim or controversy arising, other than with respect to perfection and enforcement of Lender's rights against the Real Property Collateral, shall be Orange County, California, or the applicable federal district court that covers said County, and Indemnitor submits to personal jurisdiction in that forum for any and all purposes. Indemnitor waives any right Indemnitor may have to assert the doctrine of forum non conveniens or to object to such venue.

INDEMNITOR'S INITIALS: _____

11.    **CHOICE OF FORUM.** AS A SPECIFICALLY BARGAINED INDUCEMENT FOR LENDER TO EXTEND CREDIT TO INDEMNITOR, INDEMNITOR AGREES THAT ANY ACTION, SUIT, OR PROCEEDING IN RESPECT OF OR ARISING OUT OF THIS INDEMNITY, ITS VALIDITY, OR PERFORMANCE, WITHOUT LIMITATION ON THE ABILITY OF LENDER, ITS SUCCESSORS AND ASSIGNS, TO INITIATE AND PROSECUTE IN ANY APPLICABLE JURISDICTION ACTIONS RELATED TO THE ENFORCEMENT OF THIS INDEMNITY, MAY BE INITIATED AND PROSECUTED AS TO ALL PARTIES AND THEIR SUCCESSORS AND ASSIGNS. LENDER AND INDEMNITOR EACH CONSENTS TO AND SUBMITS TO THE EXERCISE OF JURISDICTION OVER ITS PERSON BY ANY STATE COURT SITTING IN THE CITY OR COUNTY IN WHICH THE PROPERTY IS LOCATED, OR THE COUNTY IN WHICH NOTICE SHALL BE SENT TO LENDER PURSUANT TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS AS DIRECTED BY LENDER, OR ANY UNITED STATES OF AMERICA COURT SITTING IN CALIFORNIA HAVING JURISDICTION OVER THE SUBJECT MATTER AND EACH CONSENTS THAT ALL SERVICE OF PROCESS BE MADE BY CERTIFIED MAIL DIRECTED TO INDEMNITOR AND LENDER AT THEIR RESPECTIVE ADDRESSES AS SET FORTH BELOW (OR SUCH OTHER ADDRESS AS A PARTY MAY FROM TIME TO TIME DESIGNATE FOR ITSELF BY NOTICE TO THE OTHER PARTY) OR AS OTHERWISE PROVIDED UNDER THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED. INDEMNITOR WAIVES ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED UNDER THIS INDEMNITY,

Val-Chris00219

AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT.

**12.** **Provisions Severable.** Every provision of this Indemnity is intended to be severable. If any provision of this Indemnity or the application of any provision to any party or circumstance is declared to be illegal, invalid, or unenforceable for any reason by a court of competent jurisdiction, such invalidity shall not affect the balance of the terms and provisions of this Indemnity or the application of the provision in question to any other party or circumstance, all of which shall continue in full force and effect.

**13.** **No Waiver.** No failure or delay on the part of any Indemnitee to exercise any power, right, or privilege under this Indemnity shall impair any such power, right, or privilege, or be construed to be a waiver of any default or an acquiescence in such failure or delay, nor shall any single or partial exercise of such power, right, or privilege preclude other or further exercise of that or any other right, power, or privilege. No provision of this Indemnity may be changed, waived, discharged, or terminated except by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge, or termination is sought.

**14.** **Counterparts: Section Captions.** This Indemnity may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Indemnity with the same effect as if all parties had signed the same signature page. Any signature page of this Indemnity may be detached from any counterpart of this Indemnity and reattached to any other counterpart of this Indemnity identical in form but having attached to it one or more additional signature pages. Captions in sections are included for convenience only. They are not to be utilized in interpreting this Indemnity.

**15.** **Confirmation of Authority.** The Indemnitor (and their representatives, executing below) have full power, authority, and legal right to execute this Indemnity and to perform all of their obligations under this Indemnity.

**16.** **Gender.** As used in this Indemnity, the singular shall include the plural and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

**17.** **Merger.** All prior understandings, representations, and agreements with respect to this Indemnity are merged into this Indemnity, which alone fully and completely expresses the agreement of the parties.

**18.** **Loan Agreement.** This Agreement is subject to the provisions of the Loan Agreement, which is incorporated herein.

**19.** **Capitalized Terms.** Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Loan Documents.

INDEMNITOR:

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

Val-Chris00220

EXHIBIT "A"
REAL PROPERTY DESCRIPTION

Lot 1, of KLEIMANN ADDITION, a subdivision in Galveston County, Texas, according to the Map or Plat thereof recorded in Volume 254-A, Page 75 and transferred to Volume 2, Page 6, both of the Map Records of Galveston County, Texas, together with the 20 feet alley adjacent on the North, abandoned by ordinance by the City pf Galveston, recorded in File no. 8132795, in the Office of the County Clerk of Galveston County, Texas.
Commonly known as: 3001 Kleinmann Avenue, Galveston, TX 77551
APN: 4400-0000-0001-000

Val-Chris00221

# PRIVACY POLICY

We collect nonpublic personal information about you from the following sources:

Information we receive from you on applications and other forms;
Information about your transactions with us, our affiliates and other forms;
Information we receive from a consumer reporting agency.

We do not disclose any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.

We restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

## PATRIOT ACT INFORMATION DISCLOSURE
### IMPORTANT INFORMATION ABOUT APPLICATION PROCEDURES

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies every customer.

What this means for you: When you apply for a loan, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

### ACKNOWLEDGMENT OF RECEIPT

*I received a copy of this notice as of October 29, 2024.*

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

Val-Chris00222

# CALIFORNIA BORROWER/BROKER STATEMENT

Lender:     Val-Chris Investments Inc
CFL License No.:  6035063
Lender's Address:  2601 Main Street, Suite 400, Irvine, California 92614

This loan is made pursuant to the California Finance Lenders Law, Division 9 (commencing with Section 22000) of the California Finance Code. Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) is a licensed finance lender, Department of Business Oversight California Finance Lenders License No. 6035063.

California's Finance Lenders Law requires that a licensed finance lender obtain a signed statement from a borrower as to whether any person has performed any act as a broker in connection with the making of a loan. **By signing this document below, Borrower hereby confirms that no person has performed any act as broker in connection with making of the loan, except as follows:**

I.   LendMe, Inc. **(DRE License No. DRE#02119364)**

| Fee Amount | Description | Comment |
|---|---|---|
| $9,405.00 | Commission | Deliver to Broker's Address |
| $3,000.00 | Processing Fee | Deliver to Lender's Address |

**LOAN INFORMATION:**

**Date of Loan: October 29, 2024**     **Loan Amount: $330,000.00**
**Loan Maturity Date: November 1, 2025**   **Interest Rate: 12.99% per annum**

**Security:**  You are giving a security interest in the real property located at:

**3001 Kleinmann Avenue, Galveston, Texas 77551**

A full statement of (i) the actual amount of cash you receive and retain, (ii) any funds paid to third persons pursuant to your written instructions, and (iii) any fees, charges, costs, insurance premiums or other sums which have been paid or are to be paid by you or on your behalf at the time the loan is made, is set forth in the settlement statement delivered to you at settlement.

You have the right to make payment in advance in any amount at any time. Per the terms of your loan agreement, the prepayment may be applied first to any prepayment penalty due under the Loan Agreement, and the Note, then to all charges due, to interest accrued and owing at time of prepayment, and then to principal.

FOR INFORMATION CONTACT THE DEPARTMENT OF FINANCIAL PROTECTION AND INNOVATION, STATE OF CALIFORNIA

---

1

Val-Chris00223

By signing below, you acknowledge that you have received and read this disclosure as of October 29, 2024.

**BORROWER:**

DANIEL P. HIGGINS

Daniel P. Higgins, an individual

© Lightning Docs™; All Rights Reserved.
California Borrower/Broker Statement    Loan No. 20047

v188

Val-Chris00224

< **ANTI-MONEY LAUNDERING DECLARATION**

| Lender: | Borrower: |
|---|---|
| Val-Chris Investments Inc, a California corporation (CFL License No. 6035063) | Daniel P. Higgins |
| Date: | Property Address: |
| October 29, 2024 | 3001 Kleinmann Avenue, Galveston, Texas 77551 |

The Loan Agreement in addition to this Declaration requires that you affirm and declare that you and the source of all funds related to any and all payments made to Lender and any and all payments made in relation to the Loan are fully compliant with all applicable rules, regulations, opinions, and releases set forth by the U.S. Department of Treasury ("Treasury"), the Financial Crimes Enforcement Network ("FinCen"), the Internal Revenue Service ("IRS") and the Office of Foreign Asset Control ("OFAC").

**NOTICE TO BORROWER:**

Borrower attests to and affirms the following:

1. All funds paid in relation to this Loan, including, but not limited to, any deposits, fees, and any payments to be made to Lender under the Note shall be made with lawfully sourced funds which were/are deposited in a depository institution insured by a Federal or state agency located in the United States of America.

2. Borrower, its principals, subsidiaries, agents, and assigns are not subject to any inquiries, investigations, administrative hearings, and/or sanctions set forth by OFAC, Treasury, IRS, FinCen or other applicable Federal or state government agency as it pertains to money-laundering and/or tax fraud.

3. Borrower understands that any violation of the representations made in this Declaration by Borrower may be deemed an Event of Default under the Loan Agreement, Note, Security Instrument, and any other Loan Documents, and Lender may elect, in its absolute discretion, to accelerate the Loan and declare all outstanding amounts owing under the Loan Agreement, Note, Security Instrument, and other Loan Documents immediately due and payable.

4. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Loan Documents.

I acknowledge receipt of the above and certify my full understanding of all of the terms and conditions of the Loan Agreement, Note, Deed of Trust and other Loan Documents, including this Declaration as of the date set forth above.

**BORROWER:**

**DANIEL P. HIGGINS**

Daniel P. Higgins, an individual

---

1

Val-Chris00225